# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

WESTLEY LACHARLES GEORGE III,

        Defendant-Appellant.

UNPUBLISHED
July 3, 2018

No. 335641
St. Joseph Circuit Court
LC No. 15-020092-FC

Before: STEPHENS, P.J., and SHAPIRO and KRAUSE, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first degree-murder, MCL 750.316, felon in possession of a firearm, MCL 750.224f, felon in possession of ammunition, MCL 750.224f(6), carrying a concealed weapon, MCL 750.227, and possession of a firearm during the commission of a felony, MCL 750.227b. He was sentenced as a fourth-time habitual offender to life without parole for the first degree murder conviction, 4 to 20 years for the felon in possession convictions and his conviction for carrying a concealed weapon, and 2 years for the felony firearm conviction. We affirm.

## I. BACKGROUND

Defendant's convictions arise from the shooting death of Eugene Jackson in the city of Three Rivers on the night of August 20, 2015. The defendant, victim, and all of the lay witnesses were residents of the same community. The victim's mother, Christy Jackson testified that on August 15, 2015, the defendant told her that he was going to kill her son because of an earlier conflict between them. Four days later, defendant visited the victim's cousin, Darinda Brumfield, and told her he was not planning on attending her party the next day because he did not want any problems with anyone on the day of the party.

On the day of the party defendant was seen talking to Jackson at a corner near Darinda's home shortly before witnesses heard gunshots and found Jackson on the ground with gunshot wounds. The defendant was seen by several witnesses contemporaneously running down a nearby alley away from the scene. Jackson told some of the people who came to his aid that defendant shot him. Witnesses placed Jackson into a car and rushed him to a hospital where he ultimately died from four gunshot wounds.

-1-

Defendant appeared at the home of Herbert Drayton's sister not far from the shooting shortly after the shots were fired and asked Drayton for a ride home. Drayton was someone whom defendant thought of as an Uncle. The defendant told Drayton that someone had been shooting at him and Jackson. Drayton observed that the Three Rivers Police were coming down the alley and told defendant that he should go to them if someone was shooting at him. The police apprehended the Defendant. Defendant told the police while being transported to jail that another man was the shooter and that he had told defendant to put a knife in his pocket. After defendant was taken into custody and interviewed, he told police that shots had come from a vehicle that pulled up to the area while Jackson was arguing with this other individual, but he refused to name this person. Defendant denied that he was involved in the shooting.

Defendant spoke to his cellmate in the St. Joseph County Jail about his case and told him that he thought he had shot Jackson around three times. Defendant confided to his cellmate that his main concern was the resulting gunpowder residue evidence being used against him so he had washed his hands a few times while in the holding cell prior to transport to the jail. He also told the cellmate that he had given the revolver used to shoot Jackson to someone he called "Uncle."

Several of the victim's relatives testified at trial. Jackson's mother testified that the defendant told her prior to the shooting that he was going to kill her son. His cousin, Samuel Brumfield, testified that he had dropped Jackson off at the corner near his mother's house after Jackson asked him to stop so he could get out of the car after seeing the defendant. Jackson's uncle, Angelo Brown, testified that after he saw the defendant walking down the alley near his house wearing a blue hoodie and blue jeans, shots rang out so he ran outside where he found Jackson lying on the ground. He stated Jackson told him "Uncle, West Coast shot me." Brown knew the defendant to go by the name "West Coast." Other witnesses gave similar testimony, stating that they heard gunshots or what they thought to be firecrackers and observed a man prior to and after the shooting wearing blue jeans and a hoodie walking to and from the alley where the victim was shot. Additionally, forensic evidence was introduced. Samples from the defendant's hands, face, and clothes were analyzed for gunshot residue which was only found on the defendant's sweatshirt and jeans. Steven Howard, an expert in gunsmith and gunshot residue testified that he examined the bullets recovered in this case and determined that they were from a revolver due to the lack of shell casings.

After the denial of a motion for directed verdict, the defendant moved for a mistrial based upon juror misconduct when it was discovered that one of the jurors had been discussing the case at a local restaurant. The court denied the motion but the juror was dismissed and replaced with an alternate. The jury deliberated and returned the guilty verdict from which the defendant now appeals.

## II. JUROR MISCONDUCT

We review the trial court's denial of a motion for a mistrial based on juror misconduct for an abuse of discretion. *People v Messenger*, 221 Mich App 171, 175; 561 NW2d 463 (1997). The denial of a motion for a mistrial based on juror misconduct constitutes an abuse of discretion "only if the misconduct was such that it affected the impartiality of the jury or disqualified the jurors from exercising the powers of reason and judgment." *Id.* A new trial will not be granted

unless "substantial harm was done to the defendant, even if the misconduct would warrant a rebuke from the trial court. *Id*. Juror misconduct can be demonstrated with evidence pertaining to outside or extraneous influences. *Id*.

Defendant claims that the trial court abused its discretion in denying his motion for a mistrial because it was probable that the errant juror tainted the rest of the jury. He also argued that the trial court should have questioned the entire panel to determine whether they had been prejudiced by her misconduct. We disagree.

First, there is little evidence that the juror herself was exposed to any extraneous influences and therefore had no extraneous information to share with the jury as a whole. The court was informed that the juror was heard discussing the case at a local restaurant by a reporter and through a phone call from the restaurant owner. Although the juror was overheard talking about the case at a local restaurant by both informants, neither witness indicated that they observed anyone else talking to the juror about the facts of the case, responding to the juror, or offering her any verbal input. Without evidence of outside influence upon the excused juror there could be no extraneous influence on the jury due to the juror's misconduct.

Defendant further argues that the trial court should have conducted an evidentiary hearing to determine whether the jury had been subjected to any outside influences due to the juror's misconduct. The court asked the entire jury whether the dismissed juror had brought any information in from outside the jury room and two jurors verbally replied "no." The court reasonably relied on the affirmative denial of the two and the silence of the other ten to reasonably conclude that the jurors were not subjected to any improper outside influences from the excused juror. Thus there was no need for the additional step of an evidentiary hearing once the court determined from the other jurors that the excused juror did not bring in any extraneous influences.

Defendant has also not demonstrated that there was a substantial possibility that the jury's verdict was affected. *People v Budzyn*, 456 Mich 77, 89; 566 NW2d 229 (1997). "[J]urors are presumed to be impartial until the contrary is shown." *People v Miller*, 482 Mich 540, 550; 759 NW2d 850 (2008). Once the trial court was notified a second time about the juror's misconduct the court interrupted the jury deliberations and promptly dismissed her and replaced her with an alternate instructing the jury that they were to start deliberations anew. It is well settled that jurors are presumed to follow the trial court's instructions. *People v Petri*, 279 Mich App 407, 414; 760 NW2d 882 (2008). Therefore it is reasonable to presume that the verdict that the jury returned was not based on any of the discussions that the jury had during the 3 ½ hours of deliberations that occurred when the dismissed juror was still on the jury panel. The defendant has also not provided any evidence to overcome this presumption.

## III. INSUFFICIENT EVIDENCE

In reviewing a claim of insufficient evidence, this Court reviews the evidence de novo in the light most favorable to the prosecution; the test being whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 amended on other grounds 441 Mich 1201 (1992); *People v Hutner*, 209 Mich App 280, 282; 530 NW2d 174 (1995).

Defendant claims that the trial court erred when it denied his motion for a directed verdict because the prosecution did not present any direct evidence to establish the essential element of premeditation needed to support a conviction for first-degree murder. We disagree.

In order for a homicide to result in a conviction of first-degree murder, it must be proven that the accused acted intentionally and as a result of premeditation and deliberation. *People v Kelly*, 231 Mich App 627, 642; 588 NW2d 480 (1998). To prove premeditation and deliberation, the burden is on the prosecution to establish by evidence that preponderates beyond a reasonable doubt that the defendant thought about taking the victim's life beforehand and pondered and evaluated for some appreciable, though not specific, amount of time the major aspects of this choice before the act occurred. *People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998). The defendant's actions before and after the killing support an inference of premeditation and deliberation.

The strongest evidence of premeditation in this case came from statements attributed to the defendant himself. Five days before the shooting, the defendant told the victim's mother he was going to kill her son. Despite her comments to the defendant that everyone would "lose" should defendant go through with his plan to kill her son, defendant reiterated his intent to kill the victim by telling her "All right, well, you [sic] walk around with that rest in peace G Baby tee shirt and then you gonna know I wasn't playin." Additionally, two other witnesses also testified that the defendant made comments on the night before the shooting that he was not going to be attending Darinda's party the next day because he didn't want any trouble with anybody at the party.

Based on the testimony given by Ms. Jackson and the two other witnesses regarding defendant's comments, a jury could have reasonably inferred that the defendant contemplated the murder for several days prior to the shooting. Thus contrary to defendant's argument, the jury's reasonable inference that defendant's actions were premeditated was supported by evidence on the record.

Defendant also asserts that because there were no witnesses to the shooting there was no direct evidence presented to show that defendant was the shooter and the evidence proving his identity as the shooter was merely circumstantial. He misapprehends the law. "Circumstantial evidence and reasonable inferences arising therefrom can sufficiently establish the elements of a crime." *People v Schultz,* 246 Mich App 695, 702; 635 NW2d 491 (2001). There was significant testimony placing the defendant near the alley where the victim was found prior to and after the shooting. The deceased named him as his murderer. Numerous witnesses also testified to seeing the defendant fleeing the area wearing a blue sweatshirt or hoodie carrying a gun. The defendant was arrested in the area wearing a blue sweatshirt. The hooded sweatshirt later tested positive for gunshot residue. Additionally, while being held in the St. Joseph County Jail, the defendant told his cell mate that he killed Jackson, using a revolver to shoot him around three times.

Viewing the evidence and reasonable inferences in the light most favorable to the prosecution, there was sufficient evidence to convince a jury beyond a reasonable doubt that the defendant committed first-degree premeditated murder.

## IV.  INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant's ineffective assistance of counsel claim is not preserved for appeal.  "In order to preserve the issue of effective assistance of counsel for appellate review, the defendant should make a motion in the trial court for a new trial or for an evidentiary hearing." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).  Defendant did not make a motion in the trial court for a new trial or for an evidentiary hearing and both of his motions to remand before this court were denied.  "Where claims of ineffective assistance of counsel have not been preserved, our review is limited to mistakes apparent from the record." *Id*.

Defendant argues through counsel and in his Standard 4 brief, that counsel was ineffective for failing to request an instruction to support a lesser included offense of voluntary manslaughter, failing to request a mistrial for juror misconduct, and for failing to obtain the assistance of a more experienced attorney because this was trial counsel's first time as lead counsel in a first-degree murder trial.

"To prove ineffective assistance of counsel, a defendant must show: (1) that counsel's performance was deficient to the extent that it fell below an objective standard of reasonableness and (2) that counsel's deficient performance so prejudiced the defendant that it deprived him of a fair trial, i.e., that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

Defendant claims that counsel was ineffective for failing to request an instruction to support a lesser included offense of voluntary manslaughter because there was virtually no evidence presented as to premeditation.  We disagree.

Voluntary manslaughter is a necessarily lesser included offense of murder, and therefore "when a defendant is charged with murder, an instruction for voluntary. . .  manslaughter must be given if supported by a rational view of the evidence." *People v Mendoza*, 468 Mich 527, 541; 664 NW2d 685 (2003).  To show voluntary manslaughter, "one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passion." *Id.* at 535.

There was no evidence on the record of adequate or contemporaneous provocation to support an instruction of voluntary manslaughter.  There was testimony given by various witnesses that place the victim and the defendant together shortly before the shooting and none of these witnesses testified that it appeared that there were any issues or problems between the defendant and the victim at that time.  By contrast there was evidence of premeditation presented when five days prior to the shooting the defendant told the victim's mother that he was going to shoot her son.  Furthermore, the focus of trial counsel's defense argument was that someone else was the shooter.  Based on this theory of defense it would appear that trial counsel's failure to request a voluntary manslaughter instruction was a matter of trial strategy.  "Failing to request a particular jury instruction can be a matter of trial strategy." *People v Dunigan*, 299 Mich App 579, 584; 831 NW2d 243 (2013).  This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight. *People v Garza*, 246 Mich App 251, 255; 631 NW2d 764 (2001).

Defendant's additional claims of ineffective assistance of counsel pertaining to counsel's failure to request a mistrial on the grounds of juror misconduct and her failure to obtain more experienced counsel are also without merit. A trial counsel's lack of experience alone does not establish ineffective assistance. *People v Kevorkian*, 248 Mich App 373, 415; 639 NW2d 291 (2001). However, contrary to defendant's arguments, trial counsel did in in fact make an oral motion for mistrial based on the problematic juror's misconduct. She also hired another attorney to assist her in representing the defendant. Additionally, despite defendant's assertions, trial counsel did represent the defendant competently when she presented testimony from an expert in firearms and effectively cross-examined the prosecutor's witnesses in an attempt to cast doubt on their credibility. Accordingly, defendant has not carried his burden of demonstrating that he was denied effective assistance of counsel.

## V. OTHER STANDARD 4 BRIEF ISSUES

Defendant objected to the prosecutor's motion to admit the victim's dying declaration at trial so this issue is preserved. To preserve for appeal the issue whether evidence was properly admitted, a party generally must object at the time of admission and raise the same basis for objection on appeal. *People v Knox*, 469 Mich 502, 508; 674 NW2d 366 (2004). We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010). A preliminary question of law regarding admissibility, however, is subject to de novo review. *Id*.

Defendant argues that the trial court erred when it allowed the victim's statements that the defendant shot him into evidence as dying declarations because the witness testimony regarding the statements were inconsistent. We disagree.

Hearsay is generally not admissible absent an exception. MRE 802. The relevant hearsay exception at issue here is MRE 804(b)(2), which provides that in a prosecution for homicide "a statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death," is admissible under the dying declaration hearsay exception. For a statement to be admitted as a dying declaration, (1) the declarant must have been conscious of impending death, (2) death must have actually ensued, (3) admission of the statement must be sought in a criminal proceeding against the alleged perpetrator, and (4) the statement must relate to the killing. *People v Siler*, 171 Mich App 246, 251; 429 NW2d 865 (1988).

The victim made statements to various friends and family members representing that he had been shot by the defendant and indicating that he needed to get to a hospital and did not want to die. Hence there was evidence that the victim believed his death to be impending. He ultimately succumbed to his wounds and was, therefore unavailable to testify. Accordingly, the trial court properly admitted the victim's statements as dying declarations under MRE 804(b)(2). The fact that the recitations of what the victim said are inconsistent does not negate the fact that the victim's statements meet the threshold requirements to be admitted as dying declarations. Furthermore, defendant's arguments regarding inconsistency go to weight to be given the testimony, not their admissibility. *People v Hintz*, 62 Mich App 196, 203; 232 NW2d 228 (1975).

Next defendant argues that the prosecutor engaged in misconduct by offering perjured testimony from witnesses Walter Nelson and Angelo Brown. There is no indication, and defendant fails to make a valid argument, that the prosecution knowingly presented perjured testimony simply because there were inconsistencies in Nelson and Brown's testimonies. Additionally, defense counsel was able to cross-examine Nelson and Brown regarding the differences in their statements to police, preliminary examination testimony, and trial testimony so the jury had sufficient opportunity to evaluate their testimonies to determine if they were credible witnesses or not. "Witness credibility and the weight accorded to evidence is a question for the [trier of fact], and any conflict in the evidence must be resolved in the prosecution's favor." *People v McGhee*, 268 Mich App 600, 624; 709 NW2d 595 (2005). Because this argument is a challenge to both witnesses' credibility, we will defer to the trier of fact's determination and not address this issue anew. See *People v Milstead*, 250 Mich App 391, 404; 648 NW2d 648 (2002).

Lastly, defendant argues that the trial court abused its discretion when it excluded the report from defendant's firearm expert, Steven Howard, from evidence. He argues that the report constituted underlying facts or data. First we note that the expert was allowed to testify about the significance of a total lack of gunpowder residue on defendant's hands. What was excluded from evidence was his false syllogism in his report on the likelihood of the defendant's guilt. This was neither a fact nor data used in reaching an opinion. It was an opinion without data or facts. Consequently, we disagree that the exclusion of the report was in error.

Under MRE 702[1], trial courts have an obligation to ensure that any expert testimony admitted at trial is reliable. *People v Dobek*, 274 Mich App 58, 94; 732 NW2d 546 (2007). The proponent of the expert "must also show that any opinion based on those data expresses conclusions reached through reliable principles and methodology." *Id*. "Where expert testimony is purely speculative, it should be excluded or stricken pursuant to MRE 403." *Phillips v Deihm*, 213 Mich App 389, 402; 541 NW2d 566 (1995).

At the conclusion of the trial courts hearing regarding Howard's qualifications to testify, the court ruled that his preliminary investigation report would not be admitted into evidence because it was based on objectionable material. In making its ruling, the court stated:

> "All right. I do find that his testimony would be useful in the description of disbursement of gunshot residue, the particulates that are contained in it, if he can provide a basis for it. But the report will not come in as it contains his opinions on the likelihood and the mathematical certainty, which is not valid. The fact that there could be four million particulates and none were found does not mean that's

---

[1] If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

a four million in one chance that he didn't do it. That's a mathematical equation that's not actually a mathematical equation, even as there's a lot of conditions that would be used."

Thus the court, finding the opinions in the report to be based on conclusions that were not reached through reliable principles and methodology, excluded the report in accordance with its obligation to ensure that any expert opinion testimony admitted at trial is reliable. The defendant has offered no evidence, no expert affidavit or scientific periodical that negates or rebuts the court's conclusion that the expert's assertion that since there could be up to four million particulates of gun residue from a weapon the absence of any renders there only a one in four million chance that the defendant handled the gun is false.

Affirmed.

/s/ Cynthia Diane Stephens
/s/ Douglas B. Shapiro
/s/ Amy Ronayne Krause