Saad, P.J.
 

 Defendant appeals as of right from a jury trial conviction of conspiracy to commit first-degree murder, MCL 750.157a(a) and MCL 750.316, conspiracy to obstruct justice, MCL 750.157a(a) and MCL 750.505, and common-law obstruction of justice, MCL 750.505. The trial court sentenced defendant to concurrent terms of life imprisonment for the conspiracy to commit murder conviction and one to five years each for the conspiracy to obstruct justice and obstruction of justice convictions.
 

 I. NFACTS AND PROCEDURAL HISTORY
 

 In March 1999, the Gibraltar Police arrested Kent Sexton and Frank Slavik after the police received information from Brian Gross that the two robbed a Total gasoline station in 1997. The record indicates that the prosecutor also considered charging Gross with participating in the robbery, but that the charge was dropped after Gross assisted in the robbery investigation and subsequent court proceedings. Gross testified as a key witness against Sexton and Slavik at their preliminary examination on March 30, 1999, after which both Sexton and Slavik were bound over for trial on armed robbery charges. Slavik posted bond later that day and Sexton was released on bond on April 19, 1999.
 

 
 *393
 
 Several witnesses testified at trial regarding the events surrounding the charges in this case. Slavik testified that he and Sexton became friends after Sexton started working at a car audio store Slavik managed in 1994. The two worked together for approximately four years and, after Slavik left his job to start his own roofing business, the two maintained a friendship.
 
 [1]
 
 According to Slavik’s testimony and his statements to the police, on May 5, 1999, Slavik visited Sexton at his workplace, Palco Electronics, in Southgate. While talking about the armed robbery charges, Sexton commented to Slavik that the charges would be much more difficult to prove if Gross did not testify at trial. Sexton further stated that his friend “Charlie” was interested in “taking the job.”
 

 During their conversation, Sexton asked if Slavik remembered seeing a man in the courtroom during their preliminary examination, whom Sexton identified as “Charlie.” Slavik recalled seeing the man in court and identified him during this trial as defendant, Charles Milstead. Sexton further told Slavik that defendant was at the preliminary examination to kill Gross, but that he was unable to do so on that day. However, Sexton explained that the prefiminary examination allowed defendant to identify and gather information about Gross in order to kill him.
 

 According to Slavik, he told his attorney about Sexton’s comments to avoid being implicated if someone murdered Gross. Slavik testified that he also told his attorney that, at a motion hearing on May 17, 1999,
 
 *394
 
 Sexton again talked about eliminating Gross and asked Slavik if he had $7,500, which defendant demanded to be paid in two installments to perform the killing. Slavik’s attorney notified Gibraltar Police Lieutenant George Hammerle about Sexton’s statements and, after talking to Slavik on May 24, 1999, Lieutenant Hammerle contacted the Michigan State Police. On June 3, 1999, Slavik repeated his conversation with Sexton to Lieutenant Hammerle and state police Detective Sergeant Norman Lipscomb. Lieutenant Hammerle also provided Sergeant Lipscomb with a picture of defendant, whom he suspected was the man Slavik saw at the preliminary examination.
 

 Later that day, June 3, 1999, Sergeant Lipscomb asked Slavik to meet with Sexton while wearing a hidden recording device in order to gather more information about the potential murder. Slavik complied and, wearing a wire, he went to Palco Electronics to talk to Sexton. During the recorded conversation, which was also videotaped by Sergeant Lipscomb, Sexton and Slavik talked about defendant’s involvement and Sexton unsuccessfully tried to reach defendant by telephone. After Slavik left, Sergeant Lipscomb told Slavik to notify him if either defendant or Sexton tried to contact him. Over the next week, Slavik testified that he notified Sergeant Lipscomb after Sexton left messages on his answering machine, including one letting Slavik know when defendant would contact him.
 

 On June 10, 1999, Slavik allowed Sergeant Lipscomb to connect a recording device to his home telephone to record conversations and messages. Over the next four days, Slavik recorded several telephone calls, all of which were played for the jury at trial. At various times, Sexton left messages for Slavik to call
 
 *395
 
 him and defendant left a message for Slavik to contact Sexton. During one conversation on June 14, 1999, Sexton instructed Slavik that defendant would call Slavik at 11:30 P.M. and that if he did not call, Slavik should call defendant. That night, Slavik did not receive defendant’s call, so Slavik called defendant twice and left messages. Defendant returned Slavik’s call after 1:00 A.M. and offered to meet Slavik at Elizabeth Park in Trenton the next day.
 

 Before the appointed time on May 15, 1999, Slavik met Sergeant Lipscomb at the state police post and was outfitted with a recording device. Sergeant Lipscomb also provided Slavik with $3,500 in marked currency and followed Slavik to the park, where several other officers were already positioned. Defendant arrived shortly after Slavik drove into the parking lot, and the two talked for an hour to an hour and a half, all of which was recorded on audiotape and videotape by the state police. During the conversation, defendant described several methods he might use to kill Gross and defendant also recounted his involvement in several prior violent incidents involving unrelated parties. Defendant also told Slavik that he planned to kill Gross in two or three weeks, after he gathered more information. Near the end of the encounter, Slavik opened the trunk of his automobile and handed defendant an envelope containing $3,500. Defendant took the envelope and Slavik told defendant he could sit inside Slavik’s automobile to count the money. As Slavik and defendant sat in Slavik’s vehicle, the police approached and placed defendant and Slavik under arrest. The police arrested Sexton at his home later that day.
 

 Following the preliminary examination before 33rd District Court Judge Donald L. Swank on June 29,
 
 *396
 
 1999, defendant was bound over for trial on charges of conspiracy to commit murder, conspiracy to obstruct justice, and common-law obstruction of justice.
 
 [2]
 
 Defendant and Sexton were tried together before one jury. At trial, in addition to Slavik and police witnesses, defendant took the stand in his own defense and denied he ever intended to kill Gross. Defendant explained that he merely intended to abscond with Slavik’s money and planned to leave the state within two weeks.
 

 On the charge of conspiracy to commit murder, the trial court allowed the jury to consider as an alternative larceny by trick, reflecting defendant’s theory of the case. However, on November 9, 1999, the jury found defendant guilty of conspiracy to commit murder, conspiracy to obstruct justice, and common-law obstruction of justice.
 
 [3]
 
 Thereafter, defendant filed a motion for judgment notwithstanding the verdict, which the trial court denied on January 31, 2000.
 

 H. ANALYSIS
 

 A. ENTRAPMENT
 

 Defendant contends that the trial court erred in denying his motion to dismiss, which was brought on the ground of entrapment. As this Court recently explained in
 
 People v McGee,
 
 247 Mich App 325, 344; 636 NW2d 531 (2001):
 

 
 *397
 
 Whether entrapment occurred must be determined by considering the facts of each case and is a question of law for the court to decide.
 
 People v Patrick,
 
 178 Mich App 152, 154; 443 NW2d 499 (1989). The trial court must make specific findings regarding entrapment, and we review its findings under the clearly erroneous standard.
 
 People v Juillet,
 
 439 Mich 34, 61; 475 NW2d 786 (1991);
 
 People v Connolly,
 
 232 Mich App 425, 428; 591 NW2d 340 (1998). The findings are clearly erroneous if this Court is left with a firm conviction that a mistake was made.
 
 Id.
 
 at 429.
 

 Entrapment occurs if “(1) the police engage in impermissible conduct that would induce an otherwise law-abiding person to commit a crime in similar circumstances, or (2) the police engage in conduct so reprehensible that it cannot be tolerated by the court.”
 
 McGee, swpra
 
 at 344-345. The defendant bears the burden of proving entrapment by a preponderance of the evidence.
 
 People v Pegenau,
 
 447 Mich 278, 294; 523 NW2d 325 (1994). The test for entrapment is objective and “focuses on the propriety of the government’s conduct that resulted in the charges against the defendant rather than on the defendant’s predisposition to commit the crime.”
 
 People v Hampton,
 
 237 Mich App 143, 156; 603 NW2d 270 (1999). “Entrapment will not be found where the police did nothing more than present the defendant with the opportunity to commit the crime of which he was convicted.”
 
 McGee, supra
 
 at 345.
 

 Here, the trial court decided the question of entrapment at a pretrial hearing after reviewing the transcripts of the preliminary examination, seeing five audio-visual exhibits, and hearing two live witnesses, including Sexton. Sexton denied any conspiracy to commit murder and insisted that Slavik lied at the preliminary examination about Sexton’s involvement.
 
 *398
 
 Sexton further testified that Slavik called him repeatedly about contacting defendant, and that Sexton finally gave Slavik defendant’s telephone number without asking questions.
 

 We reject defendant’s argument that the police used Slavik’s friendship to induce defendant to participate in the conspiracy to murder Gross. Slavik testified that he never met defendant before the recorded telephone conversation and their meeting at Elizabeth Park. While defendant maintains that he previously met Slavik through Sexton, evidence did not show that their relationship amounted to a friendship. Defendant further argues, however, that the police exploited his friendship with Sexton. To the contrary, evidence clearly showed that Sexton had already resolved to murder Gross and had identified “Charlie” as the person to perform the killing, before the prosecutor or the police learned about or became involved in any aspect of this case.
 

 Defendant further claims that the trial court should have found entrapment because Slavik personally benefited from testifying about the murder plot. However, Slavik specifically testified that he first learned about the possible benefit of cooperating with the police only after he gave details regarding the plot to his lawyer and then to the prosecutor. Several witnesses testified that, during those meetings, Slavik revealed an existing plan between defendant and Sexton. Clearly, therefore, the police did not devise the murder plot and then induce Slavik to join. Accordingly, the trial court properly concluded that this did not amount to entrapment, and left for the jury to decide issues relating to Slavik’s credibility and the effect of any benefit he received.
 

 
 *399
 
 We also reject defendant’s contention that the police officers’ tactics would induce an otherwise law-abiding citizen to commit the crime. Specifically, defendant argues that Slavik’s offer of several thousand dollars made the crime particularly attractive. It is simply groundless to suggest that an otherwise law-abiding citizen would agree to take part in a murder plot for $7,500. Moreover, the police did not offer excessive consideration to generate a conspiracy, but merely offered what defendant demanded, a minimal sum that would not induce a reasonably upright citizen to participate in the crime.
 

 Finally, defendant complains that the police applied “constant pressure” to induce him to act. To the contrary, Sexton selected defendant to kill Gross before the police became involved, and the police pursued the matter only to identify and capture a potential murderer, and without undue persistence. Accordingly, and for the reasons set forth above, the trial court did not clearly err in finding that no entrapment occurred.
 
 [4]
 

 B. ADMISSION OF OTHER ACTS EVIDENCE
 

 Defendant next asserts both that the trial court erred and that his attorney was ineffective because the jury was allowed to view the entire surveillance
 
 *400
 
 videotape from the Elizabeth Park meeting, which included defendant’s claim that he had committed other violent acts. Specifically, defendant argues that the evidence of uncharged violent conduct was irrelevant under MRE 404(b), and that, if relevant, it was nonetheless inadmissible as more prejudicial than probative under MRE 403.
 
 [5]
 

 During his cross-examination of Slavik, defense counsel elicited testimony that, at Elizabeth Park, defendant boasted that, in the past, he shot “many kids,” that he shot someone else driving a car, and that he loved guns and owned many of them. Contrary to defendant’s arguments on appeal, the disputed evidence was directly relevant to theories asserted by both the prosecutor and defendant. The prosecutor carried the burden of proving conspiracy and properly showed that defendant recited a violent history for purposes of cementing a deal with Slavik and Sexton. Defense counsel, as a matter of trial strategy, freely admitted defendant made fanciful claims about a violent past and characterized those
 
 *401
 
 comments as mere bravado, intended to trick Slavik into giving defendant money. Defense counsel also relied on this evidence to show that defendant’s assertion that he would kill Gross was unbelievable, just as his claims about numerous prior killings were implausible.
 

 We hold that defendant’s assertions regarding violent conduct captured on the videotape and elicited by defense counsel did not constitute evidence of other bad acts only tangentially related to a matter before the jury. Rather, the evidence was directly relevant to and connected with matters the jury needed to decide. Moreover, because the evidence was highly relevant to both the prosecutor’s and defendant’s theories of the case, the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice. While the jury could view the evidence as unfavorable to defendant, the jury could have also accepted defendant’s theory and found the evidence established a lack of genuine intent to kill Gross. Thus, defendant has failed to show plain error affecting his substantial rights, and reversal on this basis is unwarranted.
 
 Carines, supra
 
 at 774.
 

 For similar reasons, we reject defendant’s claim that defense counsel was ineffective for failing to object to this evidence. “Counsel is not obligated to make futile objections.”
 
 People v Meadows,
 
 175 Mich App 355, 362; 437 NW2d 405 (1989). Moreover, in light of defendant’s posture at trial, it was sound trial strategy for defense counsel to rely on defendant’s boasting to convince the jury that defendant was insincere about his representations on the videotape.
 

 
 *402
 
 C. JUROR BIAS
 
 [6]
 

 Defendant contends he was denied a fair trial because, before trial, a prospective juror indicated a bias against him.
 

 Following the trial court’s investigation of juror misconduct, defense counsel requested a special instruction and the trial court provided one to cure any potential prejudice. Further, defense counsel exercised a peremptory challenge to excuse the juror who made the comment. Defense counsel did not ask the trial court to select a new jury and, therefore, defendant’s argument that the jury remained biased against him is not preserved for review. Accordingly, we review this issue for plain error affecting defendant’s substantial rights.
 
 Carines, supra
 
 at 774.
 

 We hold that defendant’s peremptory challenge and the trial court’s admonishments to the jury about withholding judgment until hearing the evidence and about not discussing the matter before deliberations cured any prejudice. The record indicates that defense counsel expressed satisfaction with the instruction and the removal of the suspect juror. Fur
 
 *403
 
 ther, during final instructions, the trial court reminded the jurors about the presumption of innocence and the need to decide the case only on the basis of evidence presented at trial. “It is well established that jurors are presumed to follow their instructions.”
 
 People v Graves,
 
 458 Mich 476, 486; 581 NW2d 229 (1998). Accordingly, defendant has failed to show that plain error occurred or that he suffered prejudice, and he is not entitled to relief on this basis.
 

 D. GREAT WEIGHT AND SUFFICIENCY OF THE EVIDENCE
 

 Defendant further avers that insufficient evidence supported the jury’s verdict and, alternatively, that the great weight of the evidence supported acquittal.
 
 [7]
 

 As the trial court correctly observed, defendant told Slavik on the videotape that he would have Brian Gross killed for money and told him when the killing would occur. Further, evidence clearly showed that Sexton and defendant discussed and planned the crime. This was more than sufficient to establish the crime of conspiracy to commit murder.
 
 People v Hammond,
 
 187 Mich App 105, 107-108; 466 NW2d 335 (1991). Further, regarding his great weight of the evi
 
 *404
 
 dence claim, though defendant characterizes the trial as “a contest of credibility,” he fails to explain the implausibility of witness testimony connecting him to the conspiracy and ignores the fact that the jury also viewed and listened to recordings implicating him in the crime. Nonetheless, the issue of credibility is for the jury to decide and we will not resolve credibility issues anew on appeal.
 
 People v Vaughn,
 
 186 Mich App 376, 380; 465 NW2d 365 (1990). Defendant has failed to show that the evidence clearly preponderated against the jury’s verdict and, therefore, he is not entitled to relief on this issue.
 
 [8]
 

 E. OBSTRUCTION OF JUSTICE
 

 Though defendant did not raise this issue on appeal, we find it necessary to vacate sua sponte his conviction of obstruction of justice for the same reasons set forth in the companion case,
 
 People v Sexton,
 
 250 Mich App 211; 646 NW2d 875 (2002), which we reiterate here:
 

 Our Supreme Court set forth the common-law offense of obstruction of justice in
 
 People v Thomas,
 
 438 Mich 448, 455-456; 475 NW2d 288 (1991):
 

 
 *405
 
 Obstruction of justice is generally understood as an interference with the orderly administration of justice. This Court, in
 
 People v Ormsby,
 
 310 Mich 291, 300; 17 NW2d 187 (1945), defined obstruction of justice as “ ‘impeding or obstructing those who seek justice in a court, or those who have duties or powers of administering justice therein.’ ” In
 
 People v Coleman,
 
 350 Mich 268, 274; 86 NW2d 281 (1957), this Court stated that obstruction of justice is “committed when the effort is made to thwart or impede the administration of justice.” While these definitions adequately summarize the essential concept of obstruction of justice, we believe they lack the specificity necessary to sustain a criminal conviction.
 

 The
 
 Thomas
 
 Court went on to further clarify the crime:
 

 Like breach of the peace, at common law obstruction of justice was not a single offense but a category of offenses that interfered with public justice. Blackstone discusses twenty-two separate offenses under the heading “Offences against Public Justice.” If we now simply define obstruction of justice as an interference with the orderly administration of justice, we would fail to recognize or distinguish it as a category of separate offenses. We find no basis for this at common law.
 

 To warrant the charge of common-law obstruction of justice, defendant’s conduct must have been recognized as one of the offenses falling within the category “obstruction of justice.”
 
 [Thomas, supra
 
 at 456-458, citing 4 Blackstone, Commentaries (1890), pp 161-177.]
 

 “Intimidation of a witness in judicial proceedings is an indictable offense at common law, associated with the concept of obstructing justice.”
 
 People v Vallance,
 
 216 Mich App 415, 419; 548 NW2d 718 (1996). Obviously, therefore, physically interfering with the witness’ ability to testify, especially by murdering the
 
 *406
 
 witness, clearly is an offense recognized at common law that constitutes obstruction of justice.
 
 [9]
 

 As the Court stated in
 
 Thomas,
 
 the crime of obstruction of justice occurs “
 
 ‘when the effort is made
 
 to thwart or impede the administration of justice.’ ”
 
 Thomas, supra
 
 at 455 (citation omitted). For example, in obstructing justice through coercion, the “crime is complete with the attempt” and “[wjhether the attempt succeeds in dissuading the witness is immaterial.”
 
 People v Tower,
 
 215 Mich App 318, 320; 544 NW2d 752 (1996). Thus, if a defendant harasses or physically prevents a witness from appearing or testifying, or attempts to do so, such actions constitute obstruction of justice, regardless of whether the witness ultimately appears or testifies.
 
 Id.
 

 In a case involving the obstruction of justice by physically preventing a witness from testifying in court, for actual obstruction to occur, the defendant must have committed an act in an effort to physically prevent the witness from testifying. Similarly, the crime of obstruction of justice through coercion is complete once the defendant attempts to intimidate a witness, but the defendant must actually make some oral or physical threat in order to commit the crime, likewise, here, if defendant attempted to physically harm or disable Gross, the crime of obstruction of justice would be complete, regardless of whether defendant succeeded in ultimately preventing Gross from testifying.
 

 
 *407
 
 However, the prosecutor presented no evidence of such an attempt. Though overwhelming evidence showed that defendant conspired with Sexton to kill Gross, no actual attempt was made on Gross’ life or his physical well-being. Therefore, this was not simply an unsuccessful attempt to obstruct justice, which is punishable as obstruction of justice, but a conspiracy thwarted before the coconspirators made an attempt at Gross’ life. Accordingly, contrary to the trial court’s assertion, conspiracy alone is insufficient to establish actual obstruction of justice of this kind because some act in furtherance of that goal must be present. Accordingly, defendant’s conviction of and sentence for obstruction of justice are hereby vacated. We emphasize, however, that ample evidence supported defendant’s conviction of conspiracy to obstruct justice, for which he was properly convicted and sentenced.
 

 Affirmed in part and vacated in part.
 

 [1]
 

 The record further Indicates that Sexton and Slavik roomed together from early 1998 until October of the same year. Slavik also roomed with Gross for approximately five months in 1997.
 

 [2]
 

 The court bound over Sexton for trial on charges of solicitation to commit first-degree murder, conspiracy to commit murder, conspiracy to obstruct justice, and common-law obstruction of justice.
 

 [3]
 

 The jury also convicted Sexton in this matter, and his appeal has been decided by this Court,
 
 People v Sexton,
 
 250 Mich App 211; 646 NW2d 875 (2002).
 

 [4]
 

 Defendant further contends that his criminal record shows only one misdemeanor, but that Slavik had prior convictions. Defendant develops no argument from this assertion, however. Assuming defendant makes this point to show he had no history of joining murder plots, we note that, while the lack of a record of similar misconduct is a relevant consideration,
 
 People v Turner,
 
 390 Mich 7, 22-23; 210 NW2d 336 (1973), it is not dispositive. Here, the trial court correctly ruled that no entrapment occurred and left it for the jury to decide whether defendant offered to kill Brian Gross.
 

 [5]
 

 As defendant notes, defense counsel did not preserve this issue by objecting to the showing of the complete videotape to the jury.
 
 People v Metzler,
 
 193 Mich App 541, 548; 484 NW2d 695 (1992). A defendant pressing an unpreserved claim of error “must show a plain error that affected substantial rights.”
 
 People v Carines,
 
 460 Mich 750, 774; 597 NW2d 130 (1999). Further, this Court will reverse for such an error “when the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings.”
 
 Id.
 

 With regard to defendant’s ineffective assistance of counsel claim, because defendant did not move below for a new trial or a hearing pursuant to
 
 People v Ginther,
 
 390 Mich 436; 212 NW2d 922 (1973), this Court’s review is limited to mistakes apparent on the record.
 
 People v Hurst,
 
 205 Mich App 634, 641; 517 NW2d 858 (1994). “In reviewing a defendant’s claim of ineffective assistance of counsel, the reviewing court is to determine (1) whether counsel’s performance was objectively unreasonable and (2) whether the defendant was prejudiced by counsel’s defective performance.”
 
 People v Hockey,
 
 237 Mich App 74, 76; 601 NW2d 887 (1999).
 

 [6]
 

 Defendant forfeited his claim that the trial court’s jury selection procedure was a variant of the “struck” jury method by failing to raise the issue below. We note, however, that defendant’s assertion that the trial court imposed an obligation to exercise multiple peremptory challenges at one time is simply a misstatement of fact. Further, the selection method in this case does not resemble the “struck” jury method criticized by our Courts in
 
 People v Miller,
 
 411 Mich 321; 307 NW2d 335 (1981), and
 
 People v Colon,
 
 233 Mich App 295; 591 NW2d 692 (1998). Defendant was free to use peremptory challenges one at a time, and simply waived the right to insist on immediate replacement after each by accepting the court’s invitation to use more than one at a time. As our Court stated in
 
 People v Roberson,
 
 167 Mich App 501, 517; 423 NW2d 245 (1988): “Defendant should not be allowed to assign error on appeal to something which his own counsel deemed proper at trial. To do so would allow defendant to harbor error as an appellate parachute.”
 

 [7]
 

 “The test for determining the sufficiency of evidence in a criminal case is whether the evidence, viewed in a light most favorable to the people, would warrant a reasonable juror in finding guilt beyond a reasonable doubt.”
 
 People v Nowack,
 
 462 Mich 392, 399; 614 NW2d 78 (2000). Further, as this Court recently explained in
 
 People v McCray,
 
 245 Mich App 631, 637; 630 NW2d 633 (2001):
 

 This Court reviews for an abuse of discretion the trial court’s denial of a motion for a new trial on the ground that the verdict was against the great weight of the evidence.
 
 People v Stiller,
 
 242 Mich App 38, 49; 617 NW2d 697 (2000). The test is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand.
 
 People v Gadomski,
 
 232 Mich App 24, 28; 592 NW2d 75 (1998).
 

 [8]
 

 Defendant also contends that the trial court erred in denying his posljudgment motion because Sexton’s lawyer made prejudicial remarks during closing arguments. Defendant failed to provide a record citation indicating where the alleged prejudicial argument occurred, in violation of MCR 7.212(C)(7). Defendant also failed to address the question of preservation, also in violation of that rule. Though we consider the issue forfeited, we note that defendant makes no effort to show he was prejudiced by particular comments made by Sexton’s lawyer. “A party may not merely state a position and then leave it to this Court to discover and rationalize the basis for the claim.”
 
 People v Mackle,
 
 241 Mich App 583, 604, n 4; 617 NW2d 339 (2000). Accordingly, we decline to further consider the issue.
 

 [9]
 

 Though the statute does not apply to this case, our state Legislature recently codified the crime of obstruction of justice in 2000 PA 452, MCL 750.122(6), effective March 28, 2001: “A person shall not willfully impede, interfere with, prevent, or obstruct or attempt to willfully impede, interfere with, prevent, or obstruct the ability of a witness to attend, testify, or provide information in or for a present or future official proceeding.”