*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
August 15, 2024

Plaintiff-Appellee,

v

No. 364579
Oakland Circuit Court
LC No. 2021-278397-FC

TIMOTHY STEVEN FULTZ,

Defendant-Appellant.

Before: O'BRIEN, P.J., and CAVANAGH and SHAPIRO*, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions for two counts of first-degree criminal sexual conduct (victim under 13 years old, defendant 17 years of age or older) (CSC-I), MCL 750.520b(2)(b), one count of second-degree criminal sexual conduct (victim under 13 years old, defendant 17 years of age or older) (CSC-II), MCL 750.520c(2)(b), one count of third-degree criminal sexual conduct (victim related to defendant by blood or affinity) (CSC-III), MCL 750.520d(1)(d), and one count of child sexually abusive activity (CSAA), MCL 750.145c(2). Defendant was sentenced to 25 to 50 years' imprisonment for each CSC-I conviction, 10 to 15 years' imprisonment for the CSC-II conviction, 10 to 15 years' imprisonment for the CSC-III conviction, and 10 to 20 years' imprisonment for the CSAA conviction. We affirm.

## I. BACKGROUND

This case arises from allegations that defendant sexual assaulted his stepdaughter ED and his daughter MF while they were both minors.

A three-day jury trial was held in October and November 2023. During voir dire, a prospective juror (Juror 72) stated, "I guess I would just say that I think anybody who would abuse a child is a horrible human being. [That is] my personal belief." The judge clarified that the prosecution is accusing defendant of the crime and that the jury has "to make a determination if the charges are accurate as to this defendant." The judge then asked Juror 72, "So you understand that [defendant] is presumed to be innocent right now?" Juror 72 responded, "Yes, I do." Defense counsel then excused Juror 72.

---

*Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

-1-

After voir dire and opening statements, Holly Fultz first testified that defendant was her husband. She and defendant had three daughters together, MF (18 years old), LF (15 years old), and HF (14 years old). Holly also had another daughter, ED (19 years old), who was not related to defendant. Holly, defendant, and the four girls had all been living together as a family in August 2021. On August 13, 2021, Holly entered ED's room and saw that defendant was "laying on [ED's] bed and [ED] was on him." Defendant had "one hand on [ED's] hip and the other on his penis and it was . . . in her [vagina]." Holly screamed at defendant and asked how long this had been going on. Defendant replied that it had been a couple months. Holly then asked ED the same question, and ED told Holly the assaults had been happening for eight years. Defendant left the house, and Holly called the police. After the police arrived, an officer instructed Holly to take ED to HAVEN (a local organization that cares for patients of sexual assault and domestic violence) to complete a rape kit.

Holly also testified that, in 2013 when ED was 10 years old, ED told her that defendant had "touched her." Holly remembered ED had told her that defendant "hurt [her] down there" while they had been living in their old house. Holly testified that her family had not moved into their current home until February 2014. When Holly confronted defendant about the incident in 2013, defendant denied touching ED and stated they should take ED to a psychiatrist. Holly stated she did not report the incident to the police in 2013 because defendant controlled the family's finances and threatened to take all of the children if she tried to tell anyone.

Next, ED testified she was born in May 2003, and defendant was her stepfather. On August 13, 2021, defendant came into ED's room to see what she was doing. ED was sitting on her bed, and defendant sat down on her bed next to her. Defendant then "point[ed] to his genital area and pointed back to [ED]." ED knew what defendant was implying because she and defendant had had intercourse "[m]any times." Defendant then took off ED's underwear, removed his own underwear, and gestured for ED to get on top of him. ED did what defendant wanted, and defendant put his penis inside ED's vagina. This act formed the basis for Count IV of defendant's charges, CSC-III (victim related to defendant by blood or affinity), MCL 750.520d(1)(d). Holly then came into ED's room and immediately began screaming at defendant. Holly asked ED how long this had been happening, and ED responded, "[F]rom when I told you the first time." Holly yelled at defendant to leave the house, and sometime after he left, the police arrived. Holly then took ED to receive a physical examination, where several swabs were taken of her genital area.

ED testified that the first time defendant sexually abused her she was "younger than 10." ED remembered she was that age because she had still been in elementary school and was living with her family in their first home. During the first instance of abuse, defendant came into ED's room and showed her pornography on his laptop. Defendant then started rubbing his penis and asked ED to suck on it. ED had gotten in trouble with her parents earlier in the day, and because she did not want to anger defendant again, she acquiesced and sucked on defendant's penis. This act was the basis for Count I, CSC-I (fellatio with a child under 13 years old), MCL 750.520b(2)(b). During the next instance of abuse, defendant asked ED to help him in the bathroom, and once she was inside, removed her underwear and pajama bottoms. Defendant then attempted to put his penis in her vagina. This contact to ED's genitals formed the basis for Count II, CSC-II (sexual contact with a child under 13 years old), MCL 750.520c(2)(b). ED then felt dizzy, and defendant left the bathroom. About an hour later, defendant found ED in her room and

fully put his penis in her vagina. This act was the basis for Count III, CSC-I (penis into genital opening of a child under 13 years old), MCL 750.520b(2)(b). ED testified that, after this time, defendant engaged her in sexual activity "two or three [times] a week."

ED then stated she first told Holly about the abuse in 2013 when she was 10 years old. ED testified that Holly had been worried and confronted defendant about what ED told her. ED believed defendant convinced Holly that the sexual assaults never happened. ED did not mention the assaults again, but they continued to occur. Several days after the August 2021 incident, ED was interviewed at a wellness center and disclosed the other instances of sexual abuse. During the interview in August 2021, ED stated that the first time defendant sexually assaulted her had been "three or four years ago."

Chantel Hammond, a sexual assault nurse examiner at HAVEN, testified that she performed a medical forensic examination on ED on August 14, 2021. Hammond collected DNA swabs from ED's inner genitalia and sent them in for forensic testing. Forensic scientist Andrea Young testified that she worked for the Michigan State Police in the biology DNA unit. She assessed the DNA evidence sample taken from ED's inner genitalia and compared it to defendant's buccal sample. She determined that the two samples were a match.

MF, who was 17 years old at the time of the trial, testified that defendant is her father and that she had been living with him her whole life. On either her eighth or ninth birthday, MF went to defendant's bedroom to cuddle, which MF stated "was a normal thing" for her and defendant to do. When she entered defendant's bedroom, defendant was underneath the covers, and MF laid on top of the covers on the bed. MF testified that defendant then got out from under the covers. Defendant was naked, and MF could see his "private parts." Defendant then said to MF, "[L]ick me or suck me." MF then immediately left the room. She stated that in that moment she "decided to never tell anyone about it" and went back to her room to play with her toys. This incident formed the basis for Count V of defendant's charges, CSAA, MCL 750.145c(2).

Defendant then testified on his behalf. Defendant stated he has never penetrated ED with his penis and denied having sex with ED on August 13, 2021. Defendant stated that, on the night in question, he simply watched a movie with ED and fell asleep during the movie. He then woke up to the sound of Holly yelling at him and making "vulgar accusations" at him. Defendant then denied that his pants had been down when Holly had entered the room and maintained that his pants were "around [his] waist, the same way they were when [he] fell asleep." Defendant also testified he never showed his penis to MF, nor did he ever command her to suck or lick his penis.

## II. GREAT WEIGHT OF THE EVIDENCE

Defendant argues that his CSC-I and CSC-II convictions are against the great weight of the evidence because there is conflicting testimony regarding whether ED was under 13 years old at the time of the contested sexual assaults (fellatio with ED, attempted penetration with ED in the bathroom, and penetration of ED's genital opening after leaving the bathroom). We disagree.

To preserve an issue that a conviction is not supported by the great weight of the evidence, a defendant must "rais[e] it in a motion for a new trial." *People v Musser*, 259 Mich App 215, 218; 673 NW2d 800 (2003). Here, defendant did not move for a new trial, and consequently, did

not raise his issue regarding the great weight of the evidence. Thus, defendant's issue is unpreserved. Our review of an unpreserved issue regarding the great weight of the evidence is "limited to plain error effecting [a] defendant's substantial rights." *Id*. "[T]he defendant bears the burden to show that (1) an error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error prejudiced substantial rights, i.e., the error affected the outcome of the lower court proceedings." *People v Cameron*, 291 Mich App 599, 618; 806 NW2d 371 (2011).

"The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *Musser*, 259 Mich App at 218-219. Additionally, "[c]onflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *Id*. at 219 (quotation marks and citation omitted). Specifically, "[u]nless it can be said that directly contradictory testimony was so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination." *Id*. (quotation marks and citation omitted). Further, "[i]n general, trial courts must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses . . . ." *People v Lemmon*, 456 Mich 625, 642 n 22; 576 NW2d 129 (1998) (quotation marks and citation omitted).

In *Musser*, the defendant was charged with first-degree home invasion and fourth-degree criminal sexual assault. *Musser*, 259 Mich App at 216. At trial, the complainant testified that the defendant entered her house and restrained her on her couch. *Id*. The defendant then groped the complainant's breasts and rubbed his penis over her clothed vaginal area. *Id*. at 217. After the incident, the complainant called her friend, Tonya Musser, to tell her what had happened. *Id*. However, Tonya testified that when she talked to the complainant on the phone that evening, the complainant did not bring up the defendant's alleged actions. *Id*. at 218. Instead, the complainant "sounded fine" and only discussed a financial dispute with Tonya. *Id*. On appeal, the defendant argued his convictions were against the great weight of the evidence due to the conflicting testimony at trial. *Id*. at 218. The Court concluded that the defendant's convictions were supported by the complainant's testimony. *Id*. at 219. The Court stated, "Although the complainant's credibility was challenged by the defense, we cannot say that the complainant's testimony was deprived of all probative value or that the jury could not have believed it. . . ." *Id*.

Here, defendant was convicted of CSC-I with the victim being under the age of 13. See MCL 750.520b(1) and (2)(b) (stating a defendant is "guilty of criminal sexual conduct in the first degree if he . . . engages in sexual penetration with another person" and the violation is "committed by an individual 17 years of age or older against an individual less than 13 years of age"). Even considering the contradicting evidence regarding ED's age at the time of the first sexual assaults (fellatio with ED, attempted penetration with ED in the bathroom, and penetration of ED's genital opening after leaving the bathroom, all when ED was 10 years old), we conclude there was sufficient evidence for the jury to reasonably conclude that ED was under 13 years old at the time. When Holly asked ED in 2021 how long defendant had been sexually abusing her, ED responded, "eight years." In 2013, when ED was 10 years old, she told Holly that defendant had abused her and "hurt [her] down there." Additionally, ED testified that defendant began sexually abusing her when she was 10 years old. She remembered this because her family had been living in their old house. Holly confirmed that the family did not move into their current house until 2014. Thus,

although ED also stated she told an interviewer in 2021 that defendant first sexually abused her about three or four years prior (when she was either 14 or 15 years old), "[c]onflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *Id*. at 219 (quotation marks and citation omitted). Further, "if resolution of a disputed factual question turns on the credibility of witnesses or the weight of the evidence, [this Court] will defer to the trial court, which had a superior opportunity to evaluate these matters." *People v Sexton*, 461 Mich 746, 752; 609 NW2d 822 (2000) (quotation marks and citations omitted). The jury could reasonably conclude that ED was under 13 years old during the first sexual assaults (fellatio with ED (Count I, CSC-I), attempted penetration with ED in the bathroom (Count II, CSC-II), and penetration of ED's genital opening after leaving the bathroom (Count III, CSC-I), all when ED was 10 years old). Thus, the evidence was not so heavily opposed to the verdict that it was a miscarriage of justice. Therefore, defendant is not entitled to a new trial.

## III. FAIR AND IMPARTIAL JURY

Defendant argues that he was denied the right to a fair and impartial jury when Juror 72 made allegedly prejudicial comments during voir dire. We disagree.

To preserve an issue that a defendant was denied a fair and impartial jury, the defendant must "ask the trial court to select a new jury." *People v Milstead*, 250 Mich App 391, 402; 648 NW2d 648 (2002). Here, defendant did not request a new jury or any other relief rising from his belief that prospective jurors were influenced by the comments made by Juror 72. Thus, this issue is unpreserved. "Appellate review of unpreserved constitutional claims is for plain error affecting the defendant's substantial rights." *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012).

A "[d]efendant ha[s] the right to be tried by an impartial jury." *People v Haynes*, 338 Mich App 392, 411; 980 NW2d 66 (2021). To establish that he was denied a fair and impartial trial due to the jury considering facts not in evidence, a defendant must "prove that the jury was exposed to extraneous influences" and "that these extraneous influences created a real and substantial possibility that they could have affected the jury's verdict." *People v Budzyn*, 456 Mich 77, 88-89; 566 NW2d 229 (1997).

In *Haynes*, the defendant was charged with exploiting a vulnerable adult and obtaining a vulnerable adult's money or property through fraud. *Haynes*, 338 Mich App at 399. Prospective jurors were asked whether they held any biases for law enforcement witnesses and whether they would be able to remain impartial regarding crimes against an elderly woman. *Id*. at 411. During voir dire, one juror stated that "she was 'sensitive to people doing things to the elderly that [she] view[ed] as wrong' and that the number of counts and length of time made her think that the prosecution had a significant amount of evidence against defendant . . . ." *Id*. at 412. Another juror stated that "there was no way that the officers would be in court if nothing happened . . . ." *Id*. at 413. Both of the jurors were excused during voir dire. *Id*. at 414. On appeal, the defendant argued that the excused jurors' biased comments made during voir dire tainted the other prospective jurors, and thus, he was denied his right to an impartial jury. *Id*. at 410. The Court stated that "jury misconduct would not warrant relief unless the misconduct was such that it affected the impartiality of the jury or disqualified them from exercising the powers of reason and judgment." *Id*. at 415. The Court concluded that the defendant "ha[d] not shown that the remarks

by some of the prospective jurors had any effect on the impartiality of the jury." *Id*. Further, the trial court administered an oath to each selected juror; each juror swore to render a verdict "only on the evidence introduced and in accordance with the instructions of the Court." *Id*. Thus, because "jurors are instructed to follow their instructions," the selected jurors were presumed impartial, and the defendant failed to rebut the presumption. *Id*. at 416 (quotation marks and citation omitted).

Here, like the comments made by the excused jurors in *Haynes*, we conclude Juror 72's remarks during voir dire did not create a real and substantial possibility that they could have affected the jury's verdict. After Juror 72 made her comment regarding her negative opinion of perpetrators of child sexual assault, the court reminded everyone in the courtroom that defendant was presumed innocent and that the jury's job was to determine whether defendant committed the charged crimes. Then, during preliminary jury instructions, the court reiterated that defendant was presumed innocent and the jurors may only consider properly admitted evidence in the case. Further, after closing arguments and before the jury deliberated, the court again told the jurors that defendant started with a presumption of innocence, which continues throughout the trial. The court also instructed the jurors that they "may only consider the evidence that has been properly admitted in the case." Like the jurors in *Haynes*, defendant's empaneled jury was presumed to follow the trial court's jury instructions. Defendant has not presented evidence to rebut this presumption, and thus, the jury at defendant's trial was presumed to be fair and impartial.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Mark J. Cavanagh
/s/ Douglas B. Shapiro