*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DAYKOTA DALLAS HANDRICH,

Defendant-Appellant.

UNPUBLISHED
June 18, 2026
9:10 AM

No. 369337
Mecosta Circuit Court
LC No. 2022-010584-FC

Before: WALLACE, P.J., and LETICA and FEENEY, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction of first-degree premeditated murder, MCL 750.316. The trial court sentenced defendant, as a third-offense habitual offender, MCL 769.11, to mandatory life without parole. We affirm.

## I. FACTS

This case arises out of the death of the victim, Ashley Godfrey. A police officer found the victim's body while patrolling the White Pine Trial in the early morning hours on June 3, 2022. The area that the victim's body was found was known as "the spot," which was "a known area for homeless to hang out . . . ." The victim's exposed body was lying under brush and debris, which appeared to be purposefully placed to conceal her. The victim's autopsy revealed several injuries all over her body, including a laceration to her forehead resulting from multiple blows to the head, as well as fractured cartilage in her neck. The victim's cause of death was "[m]ultiple injuries including blunt force and strangulation," and her manner of death was ruled a homicide.

Officers were quickly directed to a nearby homeless shelter called Our Brother's Keeper (OBK) and alerted that defendant may have been involved. Kenneth Harvell, a resident at OBK who was "kind of dating" the victim when she was killed, testified that that at about 5:00 p.m. on May 31, 2022, he and the victim went to the store to buy alcohol, and then they traveled over to "the spot," where they found defendant. Harvell left "the spot" pretty quickly because he had to

return to OBK so that he did not set his parole ankle tether off.[1]  At about 8:20 p.m., Harvell received text messages from the victim, which read together, stated "Okay, well [defendant] is walking me back to the pharmacy and home.  Because he is a gentleman."[2]  Harvell responded to those messages, but he received nothing in return.  At about 10:00 p.m., Harvell saw defendant arrive at OBK.  Harvell testified that defendant "was nervous and acting strange."  For example, he was dirty, "[p]acing[,] and rambling about some things."[3]  Defendant, who had recently been kicked out of OBK, begged the OBK workers to let him to stay there for the night, but they did not allow him to.[4]  Harvell never saw the victim again after that night.

On June 3, 2022, defendant was arrested in front of a Super 8 motel and transported to a secure interview room at Big Rapids Police Department.  Defendant had the victim's cell phone and debit card in his possession.  Defendant waived his *Miranda*[5] rights and spoke with detectives for approximately three hours total.  Defendant initially denied any knowledge about the victim's death, but he eventually admitted that on May 31, 2022, he drank alcohol and had sex with the victim at "the spot."  Defendant told the officers that the victim asked him to hit and choke her with his hands because she liked pain, but at one point, he hit her too hard across the face, and she stopped responding.  Defendant explained that he got scared and tried to wake her up, but she would not.  He "couldn't bear looking at her anymore," so he dragged her body to the area that police found her and covered her up with sticks.  Defendant further told the officers that he had returned to "the spot" since the victim's death to clean the area up and "hang out" with people, and he clarified that this was not an "anger thing, it was drinking and an accident."

Once defendant was moved to the jail, he began talking about this case with an inmate ("the inmate") that he was housed with.  The inmate decided to reach out to the Mecosta County Prosecutor's office after defendant started "telling [him] stuff about killing a lady and then trying to blame it on somebody . . . ."[6]  In May 2023, officers conducted two interviews with the inmate.  After the first interview, defendant tried to get the inmate to help him concoct a story framing Harvell for the murder.  The inmate convinced defendant to write down the whole truth so that he

---

[1] Harvell's ankle tether allowed officers to confirm that he was not at "the spot" when the victim died.

[2] Those are the last messages that were ever sent from the victim's phone.

[3] The lead coordinator at OBK testified that this was typical behavior for defendant to exhibit after he had been drinking.  Specifically, defendant was usually argumentative and "wanting to fight" after he had been drinking.

[4] Defendant again returned to OBK on about June 1, 2022 or June 2, 2022, looking to get enrolled in a 30-day rehabilitation program, which typically occurred in Petosky.

[5] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[6] The inmate never had any intention of providing information in exchange for personal benefit; he just thought it was the right thing to do.  Accordingly, the inmate did not receive a deal in exchange for testifying in this case.

could help him point out what parts of the story he should change. The inmate then turned defendant's detailed writings over to police, and they were admitted into evidence.

Defendant's written statement largely matched his statements to police officers and the inmate, but the following deviations or additions should be noted:

- Defendant told the inmate that he was the person who sent Harvell the last message from the victim's phone. The inmate noted that defendant laughed when making this admission.

- In his police interview, defendant stated that he would have stopped hitting or choking the victim if she said to stop; however, in his written statement, defendant admitted that although the victim had tried to push him away and get him to stop choking her, he choked her harder and "chose to continue because [he] was on [the] verge of climax."

- During his police interview, defendant did not mention anything about the victim putting her finger in his anus while she was performing oral sex; however, defendant's written statement stated as follows: "[The victim] asked me if she could finger my butt while giving me head[.] I pushed her off my penis[.] Expressed to her [I] felt uncomfortable with that . . . ." Moreover, the inmate testified as follows:

  [Defendant] said she started giving him the oral sex and then she stopped and was, like, do you care if I stick my finger in your butthole . . . . He didn't [say] anything so I was, like, why didn't you say anything. Why didn't you say yes or no. And the reason I kind of asked was because the whole time I'm knowing the story still ends with her dead. So I'm, like, why didn't you say something. He was, like, I don't know. I figured if I liked it I'll let it happen. If I didn't I would just say no or I'd stop her. And so he was, like, I let her do it—well, he didn't, like, give her consent but she did it. And . . . she must've did something wrong. She either like stuck two fingers or had a messed up nail because it hurt real bad. And he said I immediately just grabbed her arm back and said, "You know you just fucked up." And he said he looked at her. He said, "You just fucked up" and he seen the bottle laying right next to him. He said he picked it up and he just—he didn't say any words. He literally just acted out. He said he (descriptive sound) two times. He said almost immediately as soon as he hit her in the face, where he could see her face, and he did another gesture like kind of blew his face up, like, and I'm, like, yeah he's showing his face swelled up.

- Defendant told the inmate that when he saw that the victim was "groggy," he looked at her and decided that he had to "finish her off." When the inmate asked why defendant did not just call for help, defendant stated that he "didn't want to look like a creep."

- In his written statement, and in his statements to the inmate, defendant added that he knew that the victim was dead because he checked her neck for a pulse.

- In his police-interview, defendant stated that he accidentally kept the victim's debit card after their trip to the liquor store and that he found the victim's cell phone at "the spot" the

next day; however, in his written statement, defendant admitted that he took the victim's cell phone and debit card directly after he covered her body with sticks.

- In his police-interview, defendant stated that he did not remember what shoes the victim was wearing, but defendant told the inmate that he burned the victim's shoes.

- Defendant told the inmate that he buried the victim's ID card and exactly where it was buried. With this information, officers were able to find the victim's buried ID card.

- In his written statement, defendant admitted to watching pornography after arriving at the Super 8 motel.

Notably, geographic cell phone location data showed that defendant was at "the spot" on the evening of May 31, 2022, and defendant's DNA was the only male contributing DNA found in the victim's vaginal swab and fingernail samples. Additionally, two of defendant's ex-girlfriends testified that they had engaged in consensual choking during sex with defendant in the past, and that defendant historically stopped an action during sex if they asked him to. One of defendant's ex-girlfriends further testified that after defendant went to jail, he told her that the victim "brought up something about his past which [caused] him to fight with her and then she ended up dead." When asked what that past information was, defendant's ex-girlfriend stated "[i]f he told me [those] kind of details, I tried to block them out."

Defendant was convicted and sentenced, as stated earlier. Defendant now appeals.

## II. JURY INSTRUCTION

On appeal, defendant first argues that the trial court erred by not instructing the jury of the lesser included offense of manslaughter. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Because defense counsel requested that the trial court instruct the jury on the lesser included offense of voluntary manslaughter, this issue is preserved for appellate review. See *People v Sabin*, 242 Mich App 656, 657; 620 NW2d 19 (2000). "Claims of instructional error are reviewed de novo." *People v Montague*, 338 Mich App 29, 37; 979 NW2d 406 (2021). We review "the trial court's determination whether a jury instruction is applicable to the facts of the case for an abuse of discretion." *Id*. (quotation marks and citation omitted). "An abuse of discretion occurs when the trial court's decision is outside the range of principled outcomes." *Id*. (quotation marks and citation omitted). Moreover, "jury instructions are reviewed in their entirety, and there is no error requiring reversal if the instructions sufficiently protected the rights of the defendant and fairly presented the triable issues to the jury." *Id*.

## B. ANALYSIS

"[A] requested instruction on a necessarily included lesser offense is proper if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it." *People v Cornell*, 466 Mich 335, 357; 646 NW2d 127 (2002).

Voluntary manslaughter is a lesser included offense of murder, "with murder possessing the single additional element of malice." *People v Mendoza*, 468 Mich 527, 540; 664 NW2d 685 (2003). "[T]o show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." *Id*. at 535. Notably, "provocation is not an element of voluntary manslaughter. Rather, provocation is the circumstance that negates the presence of malice." *Id*. at 536 (citation omitted). "[T]he degree of provocation required to mitigate a killing from murder to manslaughter is that which causes the defendant to act out of passion rather than reason. Further, in order for the provocation to be adequate it must be that which would cause a reasonable person to lose control." *People v Mitchell*, 301 Mich App 282, 286-287; 835 NW2d 615 (2013) (quotation marks and citations omitted). "Not every hot-tempered individual who flies into a rage at the slightest insult can claim manslaughter." *People v Pouncey*, 437 Mich 382, 389; 471 NW2d 346 (1991). "The law cannot countenance the loss of self-control; rather, it must encourage people to control their passions." *Id*. "The determination of what is reasonable provocation is a question of fact for the factfinder," but the trial court may determine as a matter of law that no reasonable jury could find that the alleged provocation was adequate. *Id*. at 390.

In this case, the trial court excluded the voluntary manslaughter jury instruction, determining that the evidence presented did not constitute "adequate provocation to make a reasonable person act in this manner based on the injuries." On appeal, defendant points to two bases of provocation: (1) the victim's unspecified statement about defendant's past, and (2) the victim's act of placing her finger in defendant's anus. The trial court did not abuse its discretion by finding that these bases did not constitute adequate provocation. See *Montague*, 338 Mich App at 37; *Mitchell*, 301 Mich App at 286-287.

Regarding the first basis, defendant told his ex-girlfriend that the victim "brought up something about his past which [caused] him to fight with her and then she ended up dead." Defendant's ex-girlfriend was unsure what statements the victim allegedly made; therefore, it would be entirely speculative to conclude that the victim's unspecified statements would cause a reasonable person to lose control and constitute adequate provocation. Nonetheless, when the claimed provocation consists only of words, it is generally considered inadequate provocation. See *Pouncey*, 437 Mich at 391.

Regarding the second basis, there was conflicting evidence as to whether the victim placed her finger in defendant's anus. Although defendant's written statement noted that he told the victim that he was "uncomfortable" with the idea of the act, defendant told the inmate that "[he] figured if [he] liked it [he would] let it happen. If [he] didn't [he] would just say no or [he would] stop her." Moreover, one of defendant's ex-girlfriend testified that in the past, defendant had asked her "to put her finger in his butt during sex." Therefore, the evidence indicates that defendant may have initiated the act, and even if he did not initiate the act, he felt like he could simply tell the victim to stop if he did not like it. Accordingly, the evidence does not support defendant's allegation that such an act would have caused him to become so inflamed with a murderous passion that he could not make reasoned decisions. See *Mitchell,* 301 Mich App at 286-287.

Regardless, even assuming arguendo that defendant was adequately provoked, the evidence demonstrated that he had ample time to control his emotions. See *Mendoza*, 468 Mich

at 540. The following evidence supports the proposition that defendant acted deliberately, rather than spontaneously: (1) in his written statement, defendant admitted that although the victim had tried to push him away and get him to stop choking her, he choked her harder and "*chose* to continue because [he] was on [the] verge of climax" (emphasis added); (2) defendant told the inmate that when he saw that the victim was "groggy," he looked at her and decided that he had to "finish her off"; (3) according to the medical examiner, death by strangulation takes approximately two minutes; and (4) after defendant strangled the victim, he checked her neck for a pulse. This evidence strongly suggests that even if there was adequate provocation in this case, there was also "a lapse of time during which a reasonable person could control his passions." *Id*. at 535.

Accordingly, the trial court did not abuse its discretion by excluding the voluntary manslaughter jury instruction because a rational view of the evidence does not support it. See *Cornell*, 466 Mich at 357; *Montague*, 338 Mich App at 37.

"Furthermore, where a defendant is convicted of first-degree murder, and the jury rejects other lesser included offenses, the failure to instruct on voluntary manslaughter is harmless." *People v Sullivan*, 231 Mich App 510, 520; 586 NW2d 578 (1998), aff'd 461 Mich 992 (2000). In this case, the jury rejected a verdict of second-degree murder in favor of first-degree murder; therefore, any error in not providing the voluntary manslaughter jury instruction was harmless. See *id*.

## III. INSUFFICIENT EVIDENCE

Defendant further argues that there was insufficient evidence to prove first-degree premeditated murder. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

A defendant does not need to take any "special steps" to preserve a challenge to the sufficiency of the evidence. *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001). "This Court reviews de novo challenges to the sufficiency of the evidence." *People v Solloway*, 316 Mich App 174, 180; 891 NW2d 255 (2016). "To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, we review the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013) (quotation marks and citation omitted). "A prosecutor need not present direct evidence of a defendant's guilt. Rather, circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Williams*, 294 Mich App 461, 471; 811 NW2d 88 (2011) (quotation marks, citation, and alteration omitted). "The credibility of witnesses and the weight accorded to evidence are questions for the jury, and any conflict in the evidence must be resolved in the prosecutor's favor." *People v Harrison*, 283 Mich App 374, 378; 768 NW2d 98 (2009). "[W]e will not resolve credibility issues anew on appeal." *People v Milstead*, 250 Mich App 391, 404; 648 NW2d 648 (2002).

## B. ANALYSIS

First-degree premeditated murder, includes "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing." MCL 750.316(1)(a).

Relevant here, the elements of first-degree premeditated murder are: "(1) the intentional killing of a human (2) with premeditation and deliberation." *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018). Although the Legislature has not explicitly defined the meaning of premeditation and deliberation, our Supreme Court has stated that "to premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *Id.* (quotation marks, citation, and alteration omitted).

"Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a 'second look.' " *Id.* at 242 (citation omitted). Our Supreme Court has explained that "some time span between the initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation, but it is within the province of the fact-finder to determine whether there was sufficient time for a reasonable person to subject his or her action to a second look." *Id.* (quotation marks and citation omitted). Although "the minimum time necessary to exercise this process is incapable of exact determination, it is often said that premeditation and deliberation require only a brief moment of thought or a matter of seconds." *Id.* at 242-243 (quotation marks, citations, and alteration omitted). "The requisite state of mind may be inferred from defendant's conduct judged in light of the circumstances." *Id.* at 243 (quotation marks and citation omitted). "Minimal circumstantial evidence is sufficient to prove an actor's state of mind." *People v Ortiz*, 249 Mich App 297, 301; 642 NW2d 417 (2001).

In this case, defendant argues that there was insufficient evidence to prove beyond a reasonable doubt that he committed first-degree premeditated murder. We disagree.

Defendant asserts that the victim's death was an accident, arguing that: (1) defendant and the victim were engaging in consensual sex that included suffocation, (2) defendant had a history of engaging in suffocation during intercourse, (3) defendant had a history of stopping suffocation when his partner requested, and (4) there was no evidence that the victim asked defendant to stop what he was doing in this case. Although there was evidence that defendant had a history of engaging in suffocation during intercourse and that he would stop suffocating his partner when they requested, there was also evidence that the victim tried to get defendant to stop suffocating her in this case, and he refused. In his written statement, defendant specifically admitted that although the victim had tried to push him away and get him to stop choking her, he choked her harder and "chose to continue because [he] was on [the] verge of climax." Therefore, defendant's assertion that the victim's death was an accident is directly rebutted by his own statement that he chose not to stop choking her when she requested that he stop.

Additionally, there was ample evidence presented that could lead a rational trier of fact to find defendant guilty of premeditated murder in this case, i.e. to find that there was sufficient time for a reasonable person in defendant's shoes to subject his action to a second look. See *Oros*, 502 Mich at 242. The following evidence supported a finding of premeditation and deliberation in this case: (1) the nature, number, and location of the victim's wounds, including evidence of multiple

blows to her head, as well as fractured cartilage in her neck;[7] (2) defendant's DNA was found under the victim's fingernails, and officers noticed a large scratch down defendant's back that could potentially be a defensive wound;[8] (3) defendant's confession to the inmate that he sent the last text message from the victim's phone, impersonating the victim; (4) defendant's written admission that he "chose" to continue choking the victim despite her requests to stop "because [he] was on [the] verge of climax"; (5) defendant's confession to the inmate that he told the victim that she had "just fucked up" before he hit her in the face with a bottle; (6) defendant's confession to the inmate that when he saw that the victim was "groggy," he looked at her and decided that he had to "finish her off"; (7) defendant's act of checking the victim's neck for a pulse after he strangled her; (8) defendant's post offense conduct of physically concealing the crime, including covering the victim's body with brush and debris, burning the victim's shoes, burying the victim's identification card, and returning to the scene to clean up the area;[9] (9) defendant's behavior in the few days between the victim's death and his arrest, including his decision to return to "the spot" to "hang out" with people;[10] (10) defendant's various lies after the offense, including his inconsistent statements to officers, the inmate, and his ex-girlfriend;[11] and (11) defendant's attempt to leave the area shortly after the victim's death, including his request to enter a rehabilitation program in Petosky.

Taken together, this evidence could allow a rational trier of fact to find that there was sufficient time for a reasonable person in defendant's shoes to subject his action to a second look. See *Oros*, 502 Mich at 240. Therefore, the prosecution presented sufficient evidence to prove beyond a reasonable doubt that defendant was guilty of first-degree premeditated murder. See *Smith-Anthony*, 494 Mich at 676.

---

[7] "The nature and number of a victim's wounds may support a finding of premeditation and deliberation." *People v Unger*, 278 Mich App 210, 231; 749 NW2d 272 (2008). "Specifically, evidence that a victim sustained multiple violent blows may support an inference of premeditation and deliberation . . . because the time required to inflict multiple blows affords an assailant sufficient time to . . . take a second look." *Id*. (quotation marks and citations omitted). Additionally, "manual strangulation can be used as evidence that a defendant had an opportunity to take a second look." *Oros*, 502 Mich at 244 (quotation marks and citation omitted).

[8] "[E]vidence of a struggle between the defendant and the victim can be evidence of premeditation and deliberation based on the defendant's opportunity to take a second look." *Oros*, 502 Mich at 244 (quotation marks omitted).

[9] "[A] defendant's attempt to conceal the killing can be used as evidence of premeditation." *People v Gonzalez*, 468 Mich 636, 641; 664 NW2d 159 (2003).

[10] "Premeditation may be established through evidence of . . . the defendant's conduct after the homicide." *People v Walker*, 330 Mich App 378, 384; 948 NW2d 122 (2019) (quotation marks and citation omitted).

[11] "A jury may infer consciousness of guilt from evidence of lying or deception." *Unger*, 278 Mich App at 227.

IV. ADMISSION OF EVIDENCE

Defendant further argues that the trial court erred by admitting cell phone evidence showing that defendant watched pornographic materials after the victim's death. Even if we assume that the evidence was admitted in error, any error was harmless.

A. PRESERVATION AND STANDARD OF REVIEW

Defendant preserved this issue by objecting to the admission of the evidence, arguing that the evidence was not relevant, was highly prejudicial, and had no probative value. See *People v Jones*, ___ Mich App ___, ___; ___NW3d ___ (2024) (Docket No. 362854); slip op at 2. "A trial court's discretionary decisions concerning whether to admit or exclude evidence will not be disturbed absent an abuse of that discretion." *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010) (quotation marks and citation omitted). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *Jones*, ___ Mich App at ___; slip op at 3. "When the decision involves a preliminary question of law however, such as whether a rule of evidence precludes admission, we review the question de novo." *Mardlin*, 487 Mich at 614.

B. ANALYSIS

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401.[12] Generally, "[a]ll relevant evidence is admissible . . . ." MRE 402. But even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. "Notably, MRE 403 does not regulate evidence that is simply 'prejudicial' because all relevant and material evidence is prejudicial." *Jones*, ___ Mich App at ___; slip op at 3 (quotation marks and citation omitted). "Rather, it is only when the probative value is substantially outweighed by the danger of unfair prejudice that evidence is excluded." *Id*. (quotation marks and citation omitted). "This involves a two-part test: First, this Court must decide whether introduction of the evidence at trial was unfairly prejudicial. Then, this Court must apply the balancing test and weigh the probativeness or relevance of the evidence against the unfair prejudice." *Jones*, ___ Mich App at ___; slip op at 3-4 (quotation marks and citation omitted).

In this case, defendant argues that the trial court abused its discretion by admitting the cell phone evidence displaying that on both nights when defendant stayed at the Super 8 motel after the victim's death, he accessed pornographic websites for about 10 to 45 minutes at a time. Defendant specifically argues that this evidence should have been excluded under: (1) MRE 401

---

[12] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). We rely on the version of the rules in effect at the time of trial.

because it was irrelevant, and (2) MRE 403 because "[i]t was clearly offered to show that [defendant] was a sexual deviant and that this had motivated the killing."

Even assuming, arguendo, that the evidence was improperly admitted, any error was harmless. The harmless-error standard presumes that a preserved evidentiary error is not a ground for reversal unless, after an examination of the entire cause, it affirmatively appears that it is more probable than not that the error was outcome determinative. *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999). In this case, there was overwhelming evidence of defendant's guilt, and the cell phone evidence was merely cumulative to defendant's written admission that he watched pornography after arriving at the Super 8 motel. Therefore, any error in admitting the cell phone evidence was not outcome determinative. See *id*.

Affirmed.

/s/ Randy J. Wallace
/s/ Anica Letica
/s/ Kathleen A. Feeney

-10-