*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DALE RONALD BREUER,

        Defendant-Appellant.

UNPUBLISHED
March 21, 2025
12:13 PM

No. 366387
Kent Circuit Court
LC No. 20-006183-FH

Before: N. P. HOOD, P.J., and BOONSTRA and FEENEY, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of first-degree home invasion, MCL 750.110a(2); assault with intent to commit criminal sexual conduct (CSC) involving sexual penetration (assault with intent to commit CSC involving penetration), MCL 750.520g(1); assault with intent to commit second-degree CSC (assault with intent to commit CSC-II), MCL 750.520g(2); and accosting a child for immoral purposes (accosting a child), MCL 750.145a. The trial court sentenced defendant as a third-offense habitual offender, MCL 769.11, to concurrent prison terms of 210 to 480 months for the home invasion conviction, 78 to 240 months for the assault with intent to commit CSC involving penetration conviction, 42 to 120 months for the assault with intent to commit CSC-II conviction, and 36 to 96 months for the accosting a child conviction. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

In June 2020, defendant lived in the upstairs apartment of a duplex and was the landlord to a mother and three children living in the downstairs apartment. In the early morning hours of June 6, ABE, a nine-year-old girl living in the downstairs apartment, woke up to find defendant laying in her bed. Defendant was cuddling her and touching her stomach. Defendant told ABE that he had just lost a loved one, and when ABE attempted to get out of her bed, defendant grabbed her arm and pulled her back down. Defendant then kissed her hand and left, telling ABE not to tell her mother. ABE denied that defendant touched any of her "private parts," asked her to do anything sexual, or exposed himself to her. After defendant left, ABE told her mother what had

happened. Her mother called the police. ABE's mother also called defendant, but defendant denied doing anything.

That same day, ABE and her mother found a cigarette lighter on ABE's bedroom floor that did not belong to them and was not there before ABE went to bed.[1] Officers of the Grand Rapids Police Department (GRPD) collected the lighter as evidence. The DNA found on the lighter originated from one male person, and it was approximately 64 septillion times more likely that the DNA originated from defendant than an unknown contributor.

After defendant was arrested, a GRPD detective, Stephen Wiersema, listened in on one of defendant's recorded phone calls from jail, in which defendant told a friend that he was out of town on the day the incident occurred.[2] Detective Wiersema obtained warrants to search defendant's cellular phone and phone records. Defendant's cellular phone data was admitted into evidence.[3] Location data indicated that defendant's phone was near the apartment at the time of the incident and then traveled to "the Detroit area" later that day. Additionally, at approximately 12:38 a.m. on the night of the incident, defendant texted a friend, Deann Richards. Richards testified that she did not think that defendant was in a good "head space" when he texted her. Later in the morning, Richards also missed "some" phone calls from defendant. Richards testified that it would not have been uncommon for defendant to reach out to her if he was struggling personally or with alcohol issues.

Defendant denied ever entering ABE's house on the night of the incident. Defendant testified that, although he was home on the night of the incident, he did not answer his door for police because he thought that the police were serving him with a warrant for violating sex offender registration laws, and he did not want to be arrested. Defendant explained that he was required to register as a sex offender but was not registered at his current address. Defendant testified that he went to work the morning after the incident and then drove to Dearborn to pick up his cousin.

Other-acts evidence was also admitted regarding defendant's prior assaults of two other minor girls. MD, twenty-one years old at the time of trial, testified about two instances that had occurred when she was eight or nine years old. During the first instance, defendant massaged MD's shoulders and back, grabbed her hip, made "his way down to [her] pelvic area," and groped her butt cheek. During the second instance, defendant appeared to be drunk, sat on the edge on MD's bed, told her how beautiful she was, and asked her "if he could get a kiss from [her]." MD said no and hid under her blanket, and when defendant grabbed her leg, she kicked him. MD's mother kicked defendant out, and MD never saw defendant again. RS, thirty-four years old at the

---

[1] Although ABE's mother occasionally smoked with defendant, she testified that she had never shared lighters with him.

[2] Defendant testified at trial that he had been confused when he spoke to his friend about whether he was accused of having assaulted ABE on Friday or Saturday.

[3] Defendant moved to suppress this evidence on the grounds that the affidavits in support of the search warrants were overly broad and failed to establish probable cause. The trial court denied defendant's suppression motion.

time of trial, testified that when she was five years old, she woke up with her underwear on the ground and pain in her vagina, and told her mother that defendant had touched her. Defendant was subsequently convicted of first-degree CSC (CSC-I) and imprisoned for this offense. Defendant admitted that RS's testimony was true; he testified that when he was 18 years old, he digitally penetrated RS with such force that it caused her to bleed. Defendant denied MD's allegations, saying that he did not remember the first incident, and that the second incident merely involved him "goosing" MD as a joke.

Defendant was convicted and sentenced as described. After sentencing, defendant moved the trial court to vacate his accosting a minor conviction on the ground that it violated the prohibition against double jeopardy. Defendant also moved for resentencing, arguing that offense variables (OVs) 13 and 19 were improperly scored. The trial court denied defendant's motion. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant argues that there was insufficient evidence to find him guilty of assault with intent to commit CSC involving sexual penetration; assault with intent to commit CSC-II; and accosting a child. We disagree.

We review de novo a sufficiency-of-the-evidence claim, *People v Solloway*, 316 Mich App 174, 180; 891 NW2d 255 (2016), examining the evidence in the light most favorable to the prosecution to determine whether sufficient evidence has been presented to allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt, see *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013). "A prosecutor need not present direct evidence of a defendant's guilt. Rather, '[c]ircumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime.' " *People v Williams*, 294 Mich App 461, 471; 811 NW2d 88 (2011) (alteration in original), quoting *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999). "The credibility of witnesses and the weight accorded to evidence are questions for the jury, and any conflict in the evidence must be resolved in the prosecutor's favor." *People v Harrison*, 283 Mich App 374, 378; 768 NW2d 98 (2009). "[W]e will not resolve credibility issues anew on appeal." *People v Milstead*, 250 Mich App 391, 404; 648 NW2d 648 (2002). "[B]ecause it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008).

Defendant argues that all three of the challenged offenses require that an offender intends to commit a sexual act or, in the case of the accosting a minor conviction, the intent to induce or force the victim to commit a sexual act, and argues that the prosecution failed to present sufficient evidence that defendant had such intent. We disagree. Defendant argues that the only reasonable inference that can be drawn from ABE's testimony is that defendant was in the position to commit a sexual act, but he chose not to do so; therefore, he lacked the intent to commit a sexual act. We disagree.

ABE testified that she woke up in her bed, laying on her side, with defendant laying behind her, cuddling her, and touching her stomach. Defendant told ABE that he had just lost a loved

-3-

one. When ABE attempted to get out of her bed, defendant grabbed her arm and pulled her back down. When defendant left, he kissed ABE's hand and told her not to tell her mother. Text messages from defendant to Richards indicated that he was in a distressed mental state, and Richards testified that it would not have been uncommon for defendant to reach out to her if he was struggling with his sobriety or personal issues. Additionally, the jury could infer from the other-acts evidence that defendant had a history of sexually abusing girls ABE's age or younger. One of the incidents involved defendant initially massaging the victim's shoulders and back before initiating sexual touching. Another incident involved sexual penetration of a young girl in her bed, and a third incident involved defendant accosting the victim, repeatedly asking her to kiss him. See *People v Kowalski*, 489 Mich 488, 498-499; 803 NW2d 200 (2011). Defendant admitted to being intoxicated for at least one of the sexual assaults.

When viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that defendant, perhaps struggling with his sobriety, had the intent to commit sexual penetration and sexual contact when he cuddled ABE, touched her stomach, and pulled her back down on the bed. The jury could also conclude that defendant attempted to elicit or induce ABE to commit a sexual act by telling her his sad story about losing a loved one and kissing her hand. Because minimal circumstantial evidence is sufficient to prove a defendant's state of mind, *Kanaan*, 278 Mich App at 622, the jury could have reasonably concluded that defendant's intent for each of three offenses was proven beyond a reasonable doubt. See *Nickens*, 470 Mich at 627.

## III. CELLULAR PHONE EVIDENCE—SEARCH AND SEIZURE

Defendant also argues that the trial court erred by denying his motion to suppress his cellular phone records and data. We disagree.

"This Court reviews a trial court's findings of fact at a suppression hearing for clear error and reviews de novo its ultimate decision on a motion to suppress the evidence." *People v Tavernier*, 295 Mich App 582, 584; 815 NW2d 154 (2012). A trial court's finding is clearly erroneous when, although there is evidence to support it, we are, on the whole record, left with a definite and firm conviction that a mistake was made. *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859 (2008), amended 481 Mich 1201 (2008). "To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *People v Tanner*, 496 Mich 199, 206; 853 NW2d 653 (2014) (quotation marks and citation omitted).

"Both the United States and Michigan Constitutions guarantee the right against unreasonable searches and seizures." *People v Armstrong*, 344 Mich App 286, 295; 1 NW3d 299 (2022). See US Const, Am IV; Const 1963, art 1, § 11. "Searches and seizures, according to the United States Constitution and the Michigan Constitution, must be conducted reasonably, and in most cases that requires issuance of a warrant supported by probable cause, in order for the results to be admissible." *Armstrong*, 344 Mich App 286, 295 (quotation marks and citation omitted). "Probable cause for issuance of a search warrant exists if there is a substantial basis for inferring a fair probability that contraband or evidence of a crime exists in the location to be searched." *People v Malone*, 287 Mich App 648, 663; 792 NW2d 7 (2010), overruled in part on other grounds *People v Jackson*, 498 Mich 246, 265 n 9; 869 NW2d 253 (2015). In other words, probable cause

to issue a search warrant exists if there is proper nexus, or "substantial basis for inferring a fair probability that contraband or evidence of a crime exists in the stated place." *People v Unger*, 278 Mich App 210, 244; 749 NW2d 272 (2008).

"When reviewing a magistrate's decision to issue a search warrant, this Court must examine the search warrant and underlying affidavit in a common-sense and realistic manner." *Malone*, 287 Mich App at 663. "Under the totality of the circumstances, this Court must then determine whether a reasonably cautious person could have concluded that there was a substantial basis for the magistrate's finding of probable cause." *Id.* "When a person of reasonable caution would conclude that contraband or evidence of criminal conduct will be found in the place to be searched, probable cause for a search exists." *Id.*

As stated, during one of defendant's jail calls, Detective Wiersema heard defendant tell a friend that he was in Dearborn, not Grand Rapids, at the time he was accused of entering ABE's bedroom. Accordingly, the detective requested a search warrant for defendant's cell phone records in order to establish that defendant was in fact in Grand Rapids when the incident occurred. Ultimately, two warrants were obtained—one for defendant's physical cell phone, and one for defendant's cell phone records. Both warrants included the following probable-cause narrative:

> Your affiant is involved in an attempt CSC incident that took place on 6/6/2020 . . . . The CSC incident involves 9 year old victim [ABE] and 44 year old suspect [defendant]. [Defendant] is the current home owner at 60 Burton St SW which is a duplex divided into apt 1 and apt 2. [ABE] and her family currently live at 60 Burton St SW in apt 1 and [defendant] currently lives there in apt 2. [Defendant] is a registered sex offender stemming from a previous CSC-First Degree incident involving a 5 year old female victim.

> On 6/10/2020, 9-year-old victim [ABE] was forensically interviewed at the Children's Advocacy Center where she provided the following details of the incident: [ABE] disclosed that she woke up in her bedroom during the middle of the night to find [defendant] in bed with her. [ABE] disclosed when she attempted to get out of bed [defendant] pulled her back to prevent her from doing so. [ABE] disclosed that [defendant] kissed both sides of her hand and told her he would let her go if she wouldn't tell her mom. [ABE] disclosed that she struck [defendant] in the face prior to him leaving.

> On 6/19/2020, charges for Home Invasion First Degree, CSC Assault With Intent To Commit Sexual Penetration, and Accosting A Minor For Immoral Purposes, were authorized by the Kent County Prosecutors Office and on 7/1/2020 [defendant] turned himself into the Kent County Jail where he is currently lodged.

> During the course of the investigation and prior to [defendant] being lodged at the Kent County Jail, he did not provide a statement or any alibi in relation to the incident. On 9/21/2020, [defendant] contacted a friend from the jail and provided an alibi for his defense in relation to the day of the incident. Your affiant listened to the jail call where [defendant] advised he wasn't involved and indicated he had been in Dearborn MI on the day of the incident buying a Harley Davidson

motorcycle and taking a cousin back to his residence in relation to a drug recovery program.

* * *

While speaking with [defendant], [defendant's friend] retrieved [defendant's] cell phone where he and another male . . . accessed the phone and provided [defendant] with phone numbers and information pertaining to his e-mails, incoming phone calls, and text messages. Aside from [defendant] speaking about his cell phone during the conversation, he also provided an alibi that he wasn't home on the day of the incident and didn't return home until the Thursday after it took place.

The search warrant for defendant's physical cell phone also went on to explain the following:

Your affiant knows from both training and experience that valuable information can be learned from the examination of suspects cell phones, including but not limited to GPS locations, identifying cell phone numbers of calls that the suspect made before or after the incident, any text messages received or sent before or after the incident. This information can then be used to verify the suspect's whereabouts at the time of the incident and the identification of other possible witnesses in the case, thus opening up other avenues of investigation.

Furthermore, your affiant believes that a successful execution of requested search warrant will provide additional evidence of [defendant's] involvement in the incident by allowing your affiant to examine his cell phone and verify his personal location at the time the incident took place.

In denying defendant's suppression motion, the trial court found that the affidavits clearly established probable cause and that, although the warrants were "awfully broad," they were not invalid. Accordingly, Global Positioning System (GPS) location information was admitted at trial, showing that defendant was near the apartment at the time of the incident and that he traveled to "the Detroit area" later that day. Additionally, a text message sent to Richards on the night of the incident was also admitted.

A. PROBABLE CAUSE

Defendant argues that the affidavits in support of the search warrants did not establish a sufficient nexus between the items sought to be seized and the charged offenses. See *Unger*, 278 Mich App at 244. We disagree.

The search warrant affidavits stated that Detective Wiersema knew from training and experience that GPS information from cell phones could show where a cell phone was located at a specific date and time. The affidavit also stated that calls and text messages exchanged at about the time of an incident could be used to verify a suspect's whereabouts and identify other possible witnesses. Whether defendant was located at the apartment at the time of the incident was relevant and material evidence because it had a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be

without the evidence." MRE 401.[4]  Therefore, contrary to defendant's argument, the affidavits did not merely provide a generic assertion that evidence of criminal activity is often found on cell phones; instead, the affidavits—which were obtained after defendant provided an alibi to his friend on a recorded call—indicated that defendant's cell phone could uncover defendant's whereabouts at the time of the incident.

Moreover, evidence of defendant's location surrounding the time of the incident could also demonstrate defendant's consciousness of guilt, which was highly relevant because defendant's state of mind was an element at issue in multiple charges.  See *Unger*, 278 Mich App 226-227. For example, "[e]vidence of flight is admissible to support an inference of consciousness of guilt and the term flight includes such actions as fleeing the scene of the crime." *Id*. at 226 (quotation marks and citation omitted).  Furthermore, "[a] jury may infer consciousness of guilt from evidence of lying or deception," so whether defendant truthfully disclosed his whereabouts to his friend was also relevant.  *Id*. at 227.

Accordingly, because a reasonably cautious person could conclude that contraband or evidence of criminal conduct would be found in defendant's cell phone, the trial court did not err by finding that probable cause for the search warrants existed.  See *Malone*, 287 Mich App at 663.

## B.  BREADTH

Defendant also argues that the search warrants were overbroad.  We disagree.

"[A]n officer's search of seized digital data, as with any other search conducted pursuant to a warrant, must be reasonably directed at finding evidence of the criminal activity identified within the warrant." *People v Hughes*, 506 Mich 512, 542-543; 958 NW2d 98 (2020).

In this case, although the warrants did permit the search of several different types of data found on defendant's phone, including location data, text messages, Internet searches, calls, and documentation, the scope of the search was limited to evidence of defendant's involvement in the offenses charged and evidence of his location at the time the offenses took place.  Although defendant argues that the warrants permitted the police to "review the entirety of the digital data on the mere possibility that evidence may be found anywhere on the device," we find that characterization inaccurate.  Although the scope of the search was broad in one sense—permitting the search of many different kinds of data—it was not a fishing expedition; the warrants only permitted the search and seizure of evidence of defendant's involvement in the crimes charged and his location on and around the incident.  We do not find these warrants to be the sort of "general warrant[s] that gave the police license to search *everything* on defendant's cell phone in the hopes of finding anything, but nothing in particular, that could help with the investigation." *People v Carson*, ___ Mich App ___, ___; ___NW3d ___ (2024) (Docket No. 355925); slip op at 12. Rather, the warrants recognized that many *forms* of data stored on a cellular phone or recorded by

---

[4] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024.  See ADM File No. 2021-10, 512 Mich lxiii (2023).  We rely on the version of the rules in effect at the time of trial.

a cellular provider might provide information concerning defendant's whereabouts on the day in question.

In any event, even if the warrants were impermissibly overbroad, the trial court's failure to grant defendant's suppression motion was harmless in light of properly admitted evidence. A preserved evidentiary error "is not a ground for reversal unless, after an examination of the entire cause, it affirmatively appears that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999). "An error is outcome determinative if it undermined the reliability of the verdict and, in making this determination, a court should focus on the nature of the error in light of the weight and strength of the untainted evidence." *People v Musser*, 494 Mich 337, 348; 835 NW2d 319 (2013) (quotation marks and citation omitted).

In this case, the evidence of defendant's location admitted at trial was cumulative of defendant's own testimony. Defendant testified that he was in his apartment—which was in the same building as ABE's apartment—at the time of the alleged the incident. Defendant also testified that he went to work the morning after the incident and then drove to Dearborn to pick up his cousin. Additionally, the text message that defendant sent to Richards was cumulative to Richards's testimony.

Moreover, there was sufficient evidence of defendant's guilt without the challenged evidence. ABE testified about the incident, and defendant denied his involvement in the incident. "The credibility of witnesses and the weight accorded to evidence are questions for the jury . . . ." *Harrison*, 283 Mich App at 378; see also MCL 750.520h (specifically stating that a victim's testimony need not be corroborated in prosecutions under MCL 750.520g). Defendant's DNA was found on the lighter in ABE's bedroom, and ABE's mother testified that it wasn't there before ABE went to bed, supporting the conclusion that defendant had illegally entered the home (and ABE's bedroom) that night while ABE and her mother were home. And other-acts evidence was introduced, supporting that defendant had previously assaulted two young girls in their beds. The jury was permitted to consider this evidence for any matter of relevance, including defendant's propensity to commit sex crimes against minors. MCL 768.27a. Therefore, even if the trial court had erred by failing to conclude that the warrants were overbroad, any error would have been harmless. *Musser*, 494 Mich at 348.

IV. OTHER-ACTS EVIDENCE

Defendant also argues that he was denied a fair trial by the admission of other-acts evidence that was more prejudicial than probative. We disagree.

We review for an abuse of discretion a trial court's decision to admit other-acts evidence. *People v Waclawski*, 286 Mich App 634, 669-670; 780 NW2d 321 (2009). "A court abuses its discretion when it chooses an outcome that is outside the range of reasonable and principled outcomes." *Id*. at 670. "The determination whether the probative value of evidence is substantially outweighed by its prejudicial effect is best left to a contemporaneous assessment of the presentation, credibility, and effect of the testimony." *Id*. We review de novo whether the trial court properly applied the law governing the admission of evidence. See *People v Roper*, 286 Mich App 77, 91; 777 NW2d 483 (2009).

MCL 768.27a provides in pertinent part: "[I]n a criminal case in which the defendant is accused of committing a listed offense against a minor, evidence that the defendant committed another listed offense against a minor is admissible and may be considered for its bearing on any matter to which it is relevant." A listed offense is a Tier I, Tier II, or Tier III offense as defined by the Sex Offenders Registration Act, MCL 28.721 *et seq*. MCL 768.27a(2)(a); MCL 28.722(i).

Defendant was convicted of assault with intent to commit CSC involving sexual penetration, MCL 750.520g(1), which is a Tier III offense, MCL 28.722(v)(*iv*); assault with intent to commit CSC-II, MCL 750.520g(2), which is a Tier III offense, MCL 28.722(v)(*v*); and accosting a child for immoral purposes, MCL 750.145a, which is a Tier II offense, MCL 28.722(t)(*i*). The other-acts evidence regarding RS involved CSC-I, under MCL 750.520b(1)(a), and is a Tier III offense, MCL 28.722(v)(*iv*). Similarly, the other-acts evidence regarding MD involved an instance of assault with intent to commit CSC-II, MCL 750.520g(2), which is a Tier III offense, MCL 28.722(v)(*v*), and an instance of accosting a child for immoral purposes, MCL 750.145a, which is a Tier II offense, MCL 28.722(t)(*i*).

Because both the charged offenses and the other-acts evidence were listed offenses against minors, the other-acts evidence admitted could be considered for any matter to which it was relevant. See MCL 768.27a. However, evidence that is admissible under MCL 768.27a may nonetheless be excluded under MRE 403. *People v Watkins*, 491 Mich 450, 481; 818 NW2d 296 (2012). When determining whether MRE 403 requires the exclusion of other-acts evidence, "courts must weigh the propensity inference in favor of the evidence's probative value rather than its prejudicial effect. That is, other-acts evidence admissible under MCL 768.27a may not be excluded under MRE 403 as overly prejudicial merely because it allows a jury to draw a propensity inference." *Id*. at 487. But the following, non-exhaustive considerations may nonetheless lead a court to exclude such evidence:

> (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. [*Id*. at 487-488.]

In this case, the trial court considered the *Watkins* factors before it denied defendant's motions in limine, finding that the other-acts evidence was admissible pursuant to MCL 768.27a.

Regarding the first factor—the similarity between the other-acts evidence and the charged crime—the other-acts evidence was very similar to the charged crimes in this case. RS testified that defendant penetrated her while she was sleeping, MD testified that defendant asked her for a kiss while she was laying in her bed, and ABE testified that defendant got into her bed while she was sleeping. At the time of the incidents, RS was five years old, MD was eight or nine years old, and ABE was nine years old. All three young girls were familiar with defendant and had family members who were friendly with him. This factor weighs in favor of admission.

Regarding the second factor—the temporal proximity of the other acts to the charged crime—RS's incident occurred in 1994, MD's incident occurred in 2011 or 2012[5] and ABE's incident occurred in 2020. Although there is a temporal divide between the incidents, defendant was incarcerated for a total of 22 years after the incident with RS. Moreover, even when "the acts occurred some years apart, given how similar the acts are, the temporal divide between their occurrences, standing alone, does not preclude the evidence's admission." *Solloway*, 316 Mich App at 195. Therefore, this consideration weighs in favor of admission.

Regarding the third factor—the infrequency of the other acts—RS testified to one incident, MD testified to two incidents, and ABE testified as to one incident. For the reasons already discussed, defendant's access to young girls has been limited because of his incarceration and subsequent sex offender registration. Therefore, this factor weighs in favor of admission.

Regarding the fourth factor—the presence of intervening acts—the record does not display any intervening acts aside from defendant's incarceration. "To the extent that [the defendant's] release from prison is considered an intervening act, it does not support exclusion, but demonstrates that a period of time passed during which [the defendant's] ability to sexually abuse minor victims was limited." *People v Hoskins*, 342 Mich App 194, 207; 993 NW2d 48 (2022). The same is true in this case. Therefore, this factor is neutral.

Regarding the fifth factor—the lack of reliability of the evidence supporting the occurrence of the other acts—defendant concedes that this factor may have weighed in favor of admissibility. The other-acts evidence regarding RS was especially reliable because defendant was convicted of CSC-I, and at trial, defendant admitted that RS's testimony was true. The other-acts evidence regarding MD was also supported by evidence that, upon learning of the incidents against MD, MD's mother kicked defendant out, and MD never saw defendant again. Therefore, this factor weighs in favor of admission.

Regarding the final factor—the lack of need for evidence beyond the complainant's and the defendant's testimony—defendant concedes that this factor may have also weighed in favor of admissibility. Because there were no witnesses to the incident in this case, this case largely, although not entirely, involved a credibility contest between ABE and defendant. RS's and MD's testimonies were, therefore, highly probative of defendant's propensity and intent to commit the charged crimes. Therefore, this factor weighs in favor of admission.

Because the majority of the *Watkins* factors weigh in favor of admission, the trial court did not abuse its discretion by admitting the other-acts evidence. *Waclawski*, 286 Mich App at 670.

---

[5] Although the exact date of the incidents involving MD was not specified, MD testified that they occurred when she was eight or nine years old. The presentence investigation report (PSIR) in this case indicates that defendant was released from prison on parole in June of 2011 and was charged with assault with a dangerous weapon in February 2012. Although the case was dismissed, defendant was discharged from parole and returned to prison in 2012, where he served his maximum sentence.

## V. DOUBLE JEOPARDY

Defendant also argues that his convictions for assault with intent to commit CSC-II and accosting a minor violate the prohibition against double jeopardy. We disagree. "This Court reviews de novo questions of law, such as a double jeopardy challenge." *People v Gibbs*, 299 Mich App 473, 488; 830 NW2d 821 (2013).

"The Double Jeopardy Clauses of the federal and state Constitutions prohibit placing a criminal defendant twice in jeopardy for a single offense." *Carson*, ___ Mich App at ___; slip op at 8. See US Const, Am V; Const 1963, art 1, § 15. "The prohibition against double jeopardy provides three related protections: (1) it protects against a second prosecution for the same offense after acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense." *Carson*, ___ Mich App at ___; slip op at 8 (quotation marks and citation omitted). In *People v Nutt*, 469 Mich 565, 576; 677 NW2d1 (2004) (quotation marks and citation omitted), the Michigan Supreme Court stated that "[a]pplication of the same-elements test, commonly known as the *Blockburger* test, is the well-established method of defining the Fifth Amendment term 'same offence.' " The *Blockburger* test states that when "the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v United States*, 284 US 299, 304; 52 S Ct 180; 76 L Ed 306 (1932).

In this case, the *Blockburger* test is satisfied because each offense requires proof of a fact that the other does not.

The elements of assault with intent to commit CSC-II are:

(1) There must be an assault. (2) There must be a sexual purpose. . . . When the act involves contact, defendant must have intended to do the act for the purpose of sexual arousal or sexual gratification. (3) . . . When the act involves contact, defendant must have specifically intended to touch the complainant's genital area, groin, inner thigh, buttock, breast, or clothing covering those areas, or defendant must have specifically intended to have the complainant touch such area on him. (4) There must be some aggravating circumstances . . . . An actual touching is not required. [*Lasky*, 157 Mich App at 269-270 (emphasis omitted).]

The elements of accosting a child for immoral purposes, relevant to this case, are as follows: "the defendant (1) accosted, enticed, or solicited (2) a child (or an individual whom the defendant believed to be a child) (3) with the intent to induce or force that child to commit (4) a proscribed act." *Kowalski*, 489 Mich at 499. See MCL 750.145a.

Defendant argues, essentially, that the "assault" element of assault with intent to commit CSC-II, see *Lasky*, 157 Mich App at 269-270, is the same as the "accosted" element of accosting a minor, see *Kowalski*, 489 Mich at 499. We disagree. "An assault is made out from either an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery." *Nickens*, 470 Mich at 628 (quotation marks and citation omitted). See also M Crim JI 20.18(2). "[A] battery is an intentional, unconsented and harmful

-11-

or offensive touching of the person of another, or of something closely connected with the person. Therefore, a battery is the successful accomplishment of an attempted-battery assault." *Nickens*, 470 Mich at 628 (quotation marks and citations omitted). See M Crim JI 20.18(2).

In *People v Darga*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 363178); slip op at 3-4, this Court acknowledged that MCL 750.145a does not define "accost," "entice," or "solicit," and approved of the trial court's dictionary definitions as follows:

> Accost means to approach and speak to someone in an often challenging or aggressive way. Merriam Webster's College Dictionary, 11th Edition.

> Entice means to attract artfully or adroitly, or by arousing hope or desire. Merriam Webster's College Dictionary, 11th edition.

> Solicit means to approach with a request or a plea, to urge strongly, or to entice or lure, especially into evil. Merriam Webster's College Dictionary, 11th edition.

This Court's opinion in *Darga* makes it clear that accosting, enticing, and soliciting can all be accomplished verbally, without battery or placing the victim in fear of an imminent battery. Therefore, a plain reading of MCL 750.145a displays that accosting a child for immoral purposes does not require an assault. *Lasky*, 157 Mich App at 269-270. Nor does MCL 750.520g(2) require proof that a defendant accosted, enticed, or solicited a minor.

Because each offense requires proof of at least one element that the other does not, there is no double-jeopardy violation. See *Blockburger*, 284 US at 304.[6]

## VI. SENTENCING

Defendant also argues that the trial court incorrectly scored OVs 13 and 19. We disagree. We review de novo a trial court's "application of the facts to the law" to determine "[w]hether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute . . . ." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). We review the trial court's factual determinations for clear error, and those determinations must be supported by a preponderance of the evidence. *Id.* Due process requires that a defendant be sentenced only on the basis of accurate information; therefore, "a sentence is invalid if it is based on inaccurate information." *People v Miles*, 454 Mich 90, 96; 559 NW2d 299 (1997).

---

[6] Defendant alternatively argues that the convictions are mutually exclusive. However, defendant cites no authority holding that such a doctrine exists in Michigan law. In any event, regardless of whether this state's jurisprudence recognizes the principal of mutually exclusive verdicts, we conclude that it has no application here.

-12-

## A. OV 13

The trial court assessed 25 points for OV 13 on the basis that defendant was found guilty of four crimes against a person. We find no error in that assessment.

MCL 777.43 states that 25 points should be assigned for OV 13 when "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more crimes against a person," and zero points should be assigned for OV 13 when "[n]o pattern of felonious criminal activity existed." MCL 777.43(2)(a) further notes that when "determining the appropriate points under this variable, all crimes within a 5-year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in a conviction."

In *Gibbs*, 299 Mich App at 487, this Court affirmed the trial court's assessment of 25 points for OV 13, holding that "there is nothing in the language of MCL 777.43(1)(c) to support [the defendant's] argument that multiple convictions arising from the same incident cannot be considered for scoring OV 13." This Court explained as follows:

> [W]hile the robberies arose out of a single criminal episode, [the defendant] committed three separate acts against each of the three victims and these three distinct crimes constituted a pattern of criminal activity. Additionally, although some subsections of MCL 777.43 contain limitations on a trial court's ability to score for more than one instance arising out of the same criminal episode, subsection (1)(c) contains no such limitation. Accordingly, because multiple concurrent offenses arising from the same incident are properly used in scoring OV 13, the trial court did not err by assessing 25 points for that variable. [*Id*. at 488.]

However, in *People v Carll*, 322 Mich App 690, 704; 915 NW2d 387 (2018), this Court held that "a single felonious act cannot constitute a pattern" under OV 13. This Court reasoned as follows:

> Although the statute provides guidance to the courts on how to score OV 13, MCL 777.43(2), it does not define the term "continuing pattern of criminal behavior." The word "continuing" clearly refers to an event or process that takes place over time. *Merriam-Webster's Collegiate Dictionary* (11th ed.) defines "continuing" as "to keep going or add to." It defines "pattern" as "a reliable sample of traits, acts, tendencies, or other observable characteristics of a person . . . ." *Id*. Accordingly, the statute contemplates that there must be more than one felonious event. [*Id*. at 704-705.]

This Court also distinguished the case before it from *Gibbs*, reasoning that 25 points was properly assigned for OV 13 in *Gibbs* because, although "the robberies arose out of a single criminal episode, [the defendant] committed three separate acts against each of the three victims and these three distinct crimes constituted a pattern of criminal activity." *Id*. at 705 (quotation marks and citation omitted). Therefore, the primary distinction was that one "act" occurred in *Carll*, and multiple "acts" occurred in *Gibbs*.

Defendant argues that OV 13 should be assigned zero points because only two felonious acts occurred—the home invasion and the touching—and defendant's convictions arose from three theories as to defendant's intent, not multiple acts. Defendant's argument lacks merit.

The record shows that defendant committed multiple acts against ABE that resulted in his convictions. He broke into ABE's home, climbed into her bed, cuddled her, touched her stomach, grabbed her hand and kissed it, told her he had recently lost a loved one, and told her not to tell her mother. These acts resulted in four felony convictions for crimes against a person. Therefore, OV 13 was properly scored at 25 points. See MCL 777.43(1)(c).

B. OV 19

The trial court assessed 10 points for OV 19 on the basis that defendant had provided a false alibi indicating that he was in Detroit on the day of the incident. We find no error in this assessment.

MCL 777.49(c) states that 10 points should be assigned for OV 19 when "[t]he offender otherwise interfered with or attempted to interfere with the administration of justice, or directly or indirectly violated a personal protection order." Conversely, MCL 777.49(d) states that zero points should be assigned for OV 19 when "[t]he offender did not threaten the security of a penal institution or court or interfere with or attempt to interfere with the administration of justice or the rendering of emergency services by force or threat of force."

"[T]he plain and ordinary meaning of 'interfere with the administration of justice' for purposes of OV 19 is to oppose so as to hamper, hinder, or obstruct the act or process of administering judgment of individuals or causes by judicial process." *People v Hershey*, 303 Mich App 330, 343; 844 NW2d 127 (2013). "Interference with the administration of justice encompasses more than just the actual judicial process, and the conduct need not necessarily rise to the level of a chargeable offense or constitute obstruction of justice." *People v Teike*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 363705); slip op at 6 (quotation marks and citation omitted). "A trial court may properly assess points for OV 19 on the basis of a defendant's conduct after completing the sentencing offense." *Id*.

In this case, defendant did not merely deny culpability. See *People v Deweerd*, 511 Mich 979, 980-981; 990 NW2d 864 (2023). Instead, officers received a call from defense counsel, who stated that defendant had reported that he was in Detroit on the day of the incident and denied any involvement. However, defendant's cell phone records indicated that he was near the apartment at the time of the incident, and he traveled to "the Detroit area" later that day. Moreover, at trial, defendant testified that he had also told his friend, via a recorded jail phone call, that he had not been in town on the night of the alleged incident because he was confused about whether the incident occurred on Friday or Saturday. However, defendant acknowledged that the jail phone call occurred after the preliminary examination in which he heard ABE's allegations. Taken

together, the trial court could have reasonably concluded that defendant had attempted to deceive the police during an investigation by claiming an alibi defense. Therefore, OV 19 was properly assigned 10 points. See MCL 777.49(c).

Affirmed.


/s/ Mark T. Boonstra
/s/ Kathleen A. Feeney